## DILL, ET AL. *v.* THE JOBAR CORPORATION

[No. 183, September Term, 1965.]

*Decided March 15, 1966.*

18

The cause was argued before HAMMOND, HORNEY, MARBURY, BARNES and McWILLIAMS, JJ.

*Ronald H. Goodman,* with whom were *James J. Doherty* and *Friedman & Goodman* on the brief, for appellants.

*Neil Tabor,* with whom was *William L. Siskind* on the brief, for appellee.

HAMMOND, J., delivered the opinion of the Court. BARNES, J., concurs in the result.

The County Council of Baltimore County adopted the Comprehensive Western Area Zoning Map on November 15, 1962, and on it zoned for residential use a tract of land of slightly over five acres on the west side of Rolling Road running north from Powers Lane (which runs west from Rolling Road about five hundred feet north of Route 40, the Baltimore National Pike). The land had been used for some years as a Nike anti-aircraft site. Some three and nine-tenths acres of the whole fronting on Powers Lane and Rolling Road were zoned R-A (Residential apartments), three-quarters of an acre in the northwest part was zoned R-10 (Residential one-family) and slightly less than half an acre was zoned R-6 (Residential—one and two-family use). In February 1964 a petition was filed by the owners, Mr. and Mrs. Diehlmann, and The Jobar Corporation, a conditional contract purchaser, for reclassification of the whole tract on the ground of original error in the 1962 comprehensive rezoning. The Zoning Commissioner, the Board of Appeals and the Circuit Court all agreed that there had been such error, and our review of the record and our consideration of the printed and oral arguments have led us to conclude that there was a sound basis for the determination of original error made by the Zoning Board and affirmed by the Circuit Court.

It appears that when the zoning map was adopted in 1962, it in effect recognized the status of existing commercial and special exception uses to the south and west of the property and to the east, across Rolling Road. A strip of business roadside zoning extends a considerable distance along the north side of Route 40 to the west of its intersection with Rolling Road. On that corner is a restaurant known as the Double T Diner. To the north of the diner's large lot is a convalescent home which has been in operation for a number of years. To the west of the convalescent home is vacant land across which the rears of the commercial uses along Route 40 are visible from the subject property. Running north on the east side of Rolling Road from its intersection with the north side of Route 40 is a large area zoned business-major. At the intersection is a Robert Hall clothing store. North of that are large advertising billboards. North of these is an extravagantly and garishly ornamented toy discount store known as Pops, which was described by one witness as having "a disgraceful frontage appearance." To the north of Pops is a research laboratory center and a store building, followed by a small area zoned for apartments and then by land zoned for single family detached homes. Much of the business major strip along the east side of Rolling Road is directly across from that part of the Diehlmann tract, which is zoned R-A, and all of it is visible from all parts of that tract.

North of the Diehlmann land is a wooded tract of almost six acres on which is a radio transmitting tower. Immediately farther to the north is a dwelling house and lot, the rear of which abuts the radio tower land. North of the dwelling is a large tract of land owned by Baltimore County, on which are a reservoir and a pumping station. This tract is L shaped and encircles the Diehlmann land to the west and north. To the north of the Baltimore County land are residential developments on both sides of Rolling Road.

In 1960 the Diehlmanns applied for a change in the zoning of their land from its then R-6 classification to manufacturing-restricted. The Office of Planning and Zoning recommended this change as proper because of the proximity of the land to Route 40 and to the commercial uses to the south and east and southeast. The Board of Appeals found it would not be reasonable

to expect the property owners to erect homes on this site "with commercial uses to the south and across Rolling Road" and on October 11, 1961, granted the M-R zoning, subject to a number of conditions and restrictions, for construction of a plant to be used in treating metal. An appeal was taken from this action and while it was pending, the Western Area Map was adopted on November 15, 1962. At the time the map was under consideration, the Planning Board's minutes show that it had, in 1960, recommended the R-A zoning which was adopted by the Council as "transitional zoning" between the residential to the north and the commercial to the south and east and that it "recommended M-R, restricted manufacturing zoning to be shown on the Master Plan Overlay for the land to the west of Rolling Road across from the B-M zoning. It felt M-R is a perfectly valid use of land here and so recommends the property to whomever it may concern."

The Diehlmanns did not urge the Council to zone their property other than as proposed by the 1962 map because they expected the granting of the M-R zone. However, after the map was adopted, the M-R contract purchaser abandoned the contract because of the residential zoning and the delay caused by the undecided appeal from the Board's action in granting M-R zoning.

Three witnesses appeared before the Board to support the claim of original error. The president of The Jobar Corporation testified that the primary interest and activity of the corporation was the building of apartments, that it had built over five hundred in the Baltimore area in the last several years and was currently engaged in building one hundred twenty-five more. Jobar became interested in the Diehlmann property as a site for apartments but when it sought financing through Weaver Brothers, the representative of thirty large lenders, local, national and Canadian, it was informed after inquiry and investigation of its correspondents by Weaver, that none would lend money for the building of apartments on that site because of the commercial character of the neighborhood and the nature and appearance of the surrounding commercial and nonresidential activities. A further bar to the building of low rent apartments which Jobar had envisaged as the only type suitable in the area

was that public transportation is essential for successful renting of such apartment units and there was no public transportation within a practicable or reasonable distance. Thereupon Jobar felt that the most sensible and appropriate use of the property would be for a retail shopping center. The witnesses' testimony as to the impossibility of financing apartments on the site was not shaken on cross-examination.

An engineer testified that fully adequate water and sewerage were available for the proposed retail shopping center.

A qualified and experienced land planner who had testified in many cases gave his opinion that there had been error in the comprehensive rezoning of 1962. He felt that the requested rezoning to business local "represents a proper request for the minimum zoning classifications to make the property usable" and that he did not "see any way that the property can be used in its present zoning classifications, reasonably, and that the present zoning classifications are confiscatory in nature and that only a commercial use or industrial use would permit proper use of the subject tract." He gave as underlying reasons for his opinions the following: (1) at the time of the rezoning in 1962 and at the time of the hearing the surrounding land uses were entirely incompatible with residential development (referring to the stores, the diner, the billboards, the nursing home) and that the 1962 map did not recognize this; (2) the planning authorities recognized in 1960 that the influence of the surrounding commercial activities was such that light manufacturing was the suitable zoning for the property, but in the belief that such a zone should be an "overlay" on the map and not a part of the map recommended R-A as a transitional zoning, thinking that M-R could then be granted by the Board. The same belief was shared by Mr. Diehlmann—and inferentially by the District Council—who felt that M-R would be the immediately ultimate result of the 1962 rezoning. These beliefs of the planning office, Mr. Diehlmann and, it would seem, the Council, and the abandonment of the project by the contract purchaser for manufacturing use "left the subject property without a reclassification and deprived Mr. Diehlmann under this process of getting proper treatment at the time of the adoption of the map"; (3) apartment zoning may often be a proper buffer between

commercial uses and individual homes but to be a buffer there must be actual use and not vacant land and since it would be impossible to either finance apartments (the witness shared the views of Weaver Brothers) on the site or rent them if they were built, the zoning of the site for R-A as a buffer or transitional area was illusory and a mistake. This was particularly true because the reservoir and pumping station land owned by the County and which surround the Diehlmann land on the west and north effectively shield the residential developments to the north from it and acts as a buffer; (4) the Diehlmann land was as unsuitable for office use (permitted and frequently granted as a special exception in an R-A zone) as it was for apartment use, largely for the same reasons and was not, in any reasonable likelihood usable for any of the special exception uses permitted in an R-A zone because of its size and environment.

The three protestants presented themselves as their only witnesses. Two lived over a mile away and the third a block and a half away. They felt the use of the property for apartments would offer "a fine buffer zone from the present commercial" and they feared increased traffic on Rolling Road if the requested rezoning were granted, although they offered no specifics.

The law which controls the case has been stated and restated in recent opinions. Original error in comprehensive zoning or rezoning or subsequent substantial changes in the character of the neighborhood may require rezoning as a matter of law if the existing zoning classification deprives the owner of any reasonable use of his property.

> "If the owner affirmatively demonstrates that the legislative or administrative determination deprives him of all beneficial use of the property, the action will be held unconstitutional. But the restrictions imposed must be such that the property cannot be used for any reasonable purpose. It is not enough for the property owners to show that the zoning action results in substantial loss or hardship. *Pallace v. Inter City Land Co.,* 239 Md. 549, 212 A. 2d 262; *DePaul v. Board,* 237 Md. 221, 227-29, 205 A. 2d 805 (1965) and cases

therein cited. Where, as here, the facts are undisputed, the question is one of law, and the conclusion of the lower court is not entitled to the presumption of correctness which attaches to findings of fact." *Baltimore City v. Borinsky,* 239 Md. 611, 622.

Even though the existing zoning does not result in confiscation and thus *require* rezoning, original error may *permit* the agency to which the controlling legislative body has entrusted individual rezoning properly to change a classification, *Overton v. Co. Commissioners,* 225 Md. 212, if it does so on evidence before it which is substantial enough to permit reasoning minds reasonably to conclude that the strong presumption of the correctness of the original zoning or comprehensive rezoning has been overcome. *Miller v. Abrahams,* 239 Md. 263; *Pahl v. County Bd. of Appeals,* 237 Md. 294, 297; *Shadynook Imp. Assn. v. Molloy,* 232 Md. 265, 269-70, and cases cited. The opinion of an expert that there was error in the original zoning or comprehensive rezoning is not evidence substantial or strong enough to support a finding of original error unless the reasons given by the expert as the basis of his opinion, or other supporting facts relied on by him, are in themselves substantial and strong enough to do so.

In *Miller v. Abrahams, supra* at 273, in reversing the Board's action in finding original error (largely on the testimony of the expert who testified in the case before us), on the ground there was no strong or probative evidence to sustain it, Judge Prescott, for the majority of the Court, said that the expert was recognized as such in the field of planning and zoning, but added: "However, the prevailing general rule, almost universally followed, is that an expert's opinion is of no greater probative value than the soundness of his reasons given therefor will warrant."

In *Greenblatt v. Toney Schloss,* 235 Md. 9, 12, we said of another expert whose testimony that the dividing line between two zones should have been drawn elsewhere than it had been was followed by the Board in finding original error (we reversed the finding for lack of supporting evidence) : "His opinion, however, was entitled to no more force and effect than the reasons he said underlay it."

In the case before us there is no need to consider whether as a matter of law the residential rezoning was confiscatory and compelled rezoning and we do not do so. We think the testimony of the president of The Jobar Corporation and the expert, which we have heretofore detailed, as to the reasons the County Council had erred in putting the Diehlmann land in residential classifications in 1962 was strong, substantial and persuasive enough to justify the Board in the exercise of its expertise in finding that there had been original error. *Reese v. Mandel*, 224 Md. 121; *Overton v. Co. Commissioners, supra.* The rezoning to business local was not arbitrary, capricious or illegal, and, having determined this, we have at the same time fulfilled and exhausted our judicial function in reviewing zoning appeals of this nature.

*Order affirmed, with costs.*

BARNES, J., concurs in the result.