BONNIE VIEW COUNTRY CLUB,
INC. *v.* GLASS

[No. 238, September Term, 1965.]

*Decided March 22, 1966.*

The cause was argued before PRESCOTT, C. J., and HAMMOND, HORNEY, OPPENHEIMER and McWILLIAMS, JJ.

*Allan J. Malester,* with whom were *Robert L. Sullivan, Jr.,* and *Sullivan & Pittler* on the brief, for the appellant.

*Robert S. Rody* and *R. Taylor McLean* for the appellee.

PRESCOTT, C. J., delivered the opinion of the Court.

Evidencing a determination to require the appellee to run the entire length of the legal "gauntlet," appellant, after fighting losing battles before the Deputy Zoning Commissioner of Baltimore County, the County Board of Appeals, and the Circuit Court, now asks relief from this Court.

The appellee moved to dismiss the appeal principally relying upon Maryland 828 a and b. It is extremely regrettable that members of the legal profession should find themselves in disagreement as to what they had "agreed" upon with reference to the Record Extract; if there be any chance of disagreement, the better course to pursue is to have the agreement reduced to writing. As supplemented by appellee, we have found the Record Extract sufficient.

The County Board of Appeals granted a petition for reclassification of land zoned R-10 (one-family residential—10,000 feet) and R-20 (one-family—20,000 feet) to R-A (Town House Apartments) on the ground of error in the original zoning, and the correctness of its action, under the circumstances here presented, is the principal question we are called upon to answer.

The facts herein seem to present a unique picture in the annals of zoning in Maryland. The subject property consists of about 33 acres of land located in the 3rd District of Baltimore County. The comprehensive zoning map upon which the tract is zoned was adopted in 1957. We have experienced considerable difficulty in finding in the briefs and record extract a succinct, yet not too succinct, description of the surrounding and nearby zoning classifications; however, we shall do the best we can with what we have.

The tract is located on the northeast corner of Smith Avenue and Timber Ridge Road. It is bounded on the east by a private school, on the west by some R-10 and R-20 property and a portion of appellant's country club, and on the northeast by the Jones Falls Expressway and the property of Mrs. Baumgartner.

The appellee purchased the property in 1954 as an investment. After trying to sell the same for a period of years, he "commenced to wonder why." Upon investigation, it was discovered that extensive copper-mining operations had been undertaken on the property in the latter half of the last century, which were renewed for a short period during World War I. These mining operations involved the construction of a number of mining shafts, both main and lateral. The shafts proceeded from the opening site diagonally to Smith Avenue, some rang-

ing to 600 and 700 feet deep. There are at least 7 horizontal levels, in addition to the main shaft, which tend to negate the feasibility of construction of any kind above them. Photographic exhibits show that several of the old miners' shacks (of which there were originally about 60), outhouses, and other structures are still extant, but all are in poor, rotted, and dilapidated conditions; and that the land has become prey to the dumping of trash and refuse of various kinds, with certain areas being concentrated upon for that purpose.

Dr. Glass testified he had had the property on the market for about 10 years, but invariably prospective purchasers, after investigating the condition of the property and learning "the extreme cost" involved in R-10 or R-20 development, felt that it was impossible—"the cost would be too exhorbitant."

Lester Matz, a well-known and experienced engineer, testified that he had discovered the existence of the mine shafts in 1952, prior to appellee's acquisition of the property, while running a survey for another party, and that he had been consulted by at least a dozen realtors and developers with regard to the existing zoning, prior to being called for a study by appellee. He felt obliged to warn them to stay away because of the shafts and horizontal mines. Mr. Matz stated that 20 of the 33 acres contain grades up to 40% or more, and that 3 pumping stations and 3 force mains would be needed in order to sewer this tract. The deep swale coming north off of Smith Avenue would make it impossible to have front lots on Smith Avenue. This creates a considerable paving problem and expense. Moreover, 12 out of 19 tests indicated the presence of rock 4 to 10 feet deep under the land. He concluded that it would not be economically feasible to use this property for a cottage type development.

On cross-examination, Mr. Matz characterized as "silly" a question as to whether it was physically possible to develop this land as R-10, R-20; that *any* land could be so developed, but that it was a question of economics, because no one would buy land in which he could not make a profit. The reclassification of the zoning to R-A (apartment development),

"* * * is so much more suitable because it can use a good portion of the ground and we do not have to touch the poor

topography." He added that "if this piece of ground were given to me under existing zoning, I wouldn't take it." Although pumping stations are "not unusual" in R-10 and R-20 developments, "if everything works out pretty good," he noted the difference in pumping requirements as between an apartment site and R-10 site; the former required connections 3-4 feet in the ground, the latter a 50 foot right of way and sewers 8 feet deep.

J. Walter Jones, a well-known real estate expert and consultant, testified that he was consulted by appellee regarding this tract. He had been familiar with the property for years; in his opinion the tract could not be developed for cottages, because: the topography makes the development for R-10 and R-20 impractical; the rock and previous mining operations under the property make it very undesirable for housing; the proximity of Jones Falls Expressway makes it less desirable for houses than for apartments; and the high cost of development makes it unfeasible for housing development. Reasons why R-A would be the desirable and correct use are that it is economically feasible for a builder, and the property is a good transition location from the industrial area east of the beltway and the expressway and over into the housing area.

Mr. Jones further suggested that the property, in its present condition and use, with its old shacks and sheds and the conditions brought about by the dumping on the land, had had a most averse and depressing effect on the neighborhood and community, whereas the projected development of the tract into garden type apartments would be harmonious to the adjacent uses and would provide a balance in the neighborhood and would have no adverse effect on nearby properties. His examination of the zoning map revealed very little apartment zoning in this area but ample zoning had been provided for detached homes. The entire area between the subject property and Reisterstown Road, in the general area of Pikesville, had no apartment zoning, yet there is a substantial need for apartments in this area. In his opinion, the tract in question didn't lend itself to development as presently zoned, and is "in error * * * today as in 1957 * * *." The only exception to the above was the nearby De Chiaro property. Here, R-A zoning had been

granted, subject to an appeal by Mr. Sullivan, attorney for appellants in the case at bar.

Mr. Jones further testified on cross-examination, also without contradiction, that even if the zoning in question on De Chiaro's property would be changed to R-A to accommodate approximately 300 units, it would be a drop in the bucket because in his opinion, the need in this area would be several thousands, not several hundreds.

In support of his contention that there should be a balance of zoning he stated that the instant tract was an ideal place for an apartment development. It was economical to develop as such, there was logical use for it for apartments, and no market for it for any other use. The deprivation of appellee's use of this property for apartments is blighting the community. Moreover, the gas and electric line through the tract and the Jones Falls Expressway on its border do not deter apartment development, but make cottage development unfeasible.

Under present zoning, Mr. Jones declared, you would not get even three houses per acre, you would get none, because *no one would attempt to develop the land under the existing zoning.* Mr. Jones stated that he favored apartment zoning for the subject property not merely because of economics—not merely because the land was more suitable for apartment use rather than any other—but because it constituted an ideal and harmonious transition between industrial, commercial, expressway, and residential uses, and the present zoning represented an illogical, bad and impossible use.

Mr. Peter, the attorney for Mrs. Baumgartner, an owner of some 20 adjoining acres, improved by a dwelling to the north of the subject property, testified that she was "anxious" to have the property rezoned; that it now is "a dump," "an eyesore," and a "health hazard"; and that it would increase the value of her property.

A Mr. Gambrill, an adjoining property owner whose residence was about 850 feet from the subject tract opposed the rezoning, feeling that it would decrease the value of his property, cause traffic congestion on Smith Avenue, and overcrowd the local schools. He also doubted, from what he had been told, that the main portions of the mine shafts were located on the property.

Mr. Goldfein, President of appellant, opposed appellee's application, principally on the ground of increased traffic on Smith Avenue. This was all of protestant's testimony, except that of a traffic expert, which will be considered below.

Upon this evidence, the Board concluded there was error in the original zoning "probably because at the time of the adoption of the map no one brought to the attention of the authorities the physical [mine shafts] and topographical factors involved, nor the uses of the surrounding properties." This conclusion was based, of course, principally upon the testimony of Messrs. Matz and Jones. On appeal, as previously stated, the Circuit Court affirmed.

A long line of decisions of this Court has recognized that comprehensive zoning or rezoning carries a strong presumption of correctness, and those who attack the same bear a heavy burden in overcoming that presumption. It is also true that piecemeal rezoning granted by the zoning authorities has a presumption of correctness, although not so potent as the presumptions of comprehensive zoning or rezoning. We have stated on so many occasions that it is not the duty or the function of the courts to zone or rezone, the statement has become trite. "It is only where there is no room for reasonable debate or where the record is devoid of substantial, supporting facts that the courts are justified in reversing a decision of the Board or declaring its actions arbitrary or capricious." *Jobar v. Rodgers Forge,* 236 Md. 106, 120.

Bearing in mind the above principles, we feel impelled to find that the conclusion reached by the Board relative to original error was fairly debatable. We shall not repeat all of the details testified to by applicant's experts as to why the original zoning was in error. The extraordinary situation existing in 1957 (the time of comprehensive zoning or rezoning) caused by the generally unknown mine shafts and subsurface rock formations, when coupled with the topography making the property unusually unfit for single-family residential development, render that conclusion such that reasoning minds could reasonably have reached the result the agency reached upon a fair consideration of the fact picture painted by the entire record. *Board v. Oak Hill Farms,* 232 Md. 274. When this occurs, our

only course is to affirm. *Cf. A. W. Dill, et al. v. The Jobar Corporation,* 242 Md. 16.

The principal objection raised by the appellant was the increase in traffic which would be generated by the development of the property. It complains of difficulty in entering and leaving its property from Smith Avenue by automobile, and inconvenience to its members in walking and riding in golf-carts across said highway at other places—its property lies on both sides thereof.

The question does not give us serious difficulty. Applicant produced a Mr. Klinedinst of the Baltimore City Traffic Engineer's office. His counting machines showed that some 2900 vehicles passed, both ways, over Smith Avenue in a day's time at a point near the City line, which is not far distant from the subject tract. Then Joseph D. Thompson, a highly experienced Registered Professional Engineer, testified for the applicant. There is a sight distance at appellants' entrance of 398 feet to the east and 342 feet to the west; both of which were safe and adequate in the witness' opinion. Actual counts on several different days disclosed that some 2900 vehicles passed over Smith Avenue in periods of 24 to 25 hours, with peak-hour-loads of about 290 vehicles. A possible increase of about 300 cars could be expected from the proposed development, which would not come "anywhere near * * * the practical capacity of 900 to 1000 cars per hour." The witness believed that the proposed development would not only create no "undue congestion" on Smith Avenue, but that "it would not affect [traffic thereon] adversely."

The protestants produced Walter W. Ewell, a highly qualified Registered Professional Engineer, but his frank and candid testimony did not come close to taking the conclusion of the Board—"On these facts we find that the traffic situation presents no difficulty sufficient to warrant the denial of the zoning change"—out of the realm of fair debatability. Although his opinion differed from Thompson's on the practical capacity of vehicles per hour on Smith Avenue—the witness thought the proper figure to be 600—, and he thought the traffic movements from the proposed development would create "an extremely hazardous condition," he frankly admitted that the superimpo-

sition of the additional traffic from the development would not "bring [Smith Avenue] up to capacity," but merely "brought it to near capacity."

We hold that the evidence relative to traffic congestion was insufficient to render the action of the Board arbitrary, capricious, or illegal.

Appellant also questions a ruling of the Board, which excluded evidence relative to traffic congestion in Baltimore City not very far from the County line, where "Smith Avenue empties into Cross Country Boulevard." This congestion was caused by a stop-light and a school-guard directing traffic for children attending a nearby school, and was excluded because it related to conditions in the City and not in the County.

Ewell stated that the back-up from this situation did not reach the county line, and we do not see where he stated how close it came to the county line. The zoning boards, in conducting their hearings, are not bound by the strict rules of evidence of a trial at law, but are permitted a reasonable discretion in admitting or excluding evidence. We do not deem it necessary or desirable to make an explicit ruling on the admissibility, *vel non*, of this evidence, but we will assume, without deciding, that it was admissible, and hold that its exclusion did not constitute reversible error.

Finally, appellee argues that the appellant is not an "aggrieved" person, and, therefore, has no standing to appeal under the statute. Again, if we assume, without deciding the question, that it does have such standing, we have already held that it is not entitled to prevail.

> *Appellee's motion to dismiss denied; order affirmed; appellant to pay the costs.*