## COUNTY COMMISSIONERS OF CECIL COUNTY, ET AL. *v.* PHILLIPS ET AL.

[No. 394, September Term, 1969.]

*Decided October 10, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, McWILLIAMS, FINAN and SMITH, JJ.

*George W. Constable,* with whom was *Kenneth A. Wilcox* on the brief, for Elk Paper Manufacturing Company, one of the appellants.

*William B. Calvert* for the County Commissioners of Cecil County, the other appellant.

*Leonard E. Wilson* for appellees.

McWILLIAMS, J., delivered the opinion of the Court.

The Elk Paper Manufacturing Company (the Company) was established in 1843. For the succeeding 123 years it made paper on a 27 acre tract which straddles Little Elk Creek and lies within the quadrangle formed by the villages of Childs, Leeds, Cherry Hill and Singerly. The area is about three miles north of Elkton.

Captain John Smith first explored the rivers of Cecil County in 1608; 354 years later, on 30 June 1962, the county's first comprehensive zoning ordinance was enacted. Prior thereto, according to the Planning Commission's Master Development Plan, the land within the quadrangle and for miles around, except, of course, the Company's 27 acres, was devoted entirely to agricultural and low density residential uses.

The Company's 27 acre tract was placed in the M-2 (heavy industrial) classification. Abutting the Company's land to the north was the 88 acre Jarvineen tract; abutting to the south was the 134 acre Blevins tract. A 20 acre portion of the Jarvineen tract adjoining the Company's land was also placed in the M-2 classification as was a 30 acre portion of the Blevins land. Thus there

was created by the county's first comprehensive zoning ordinance a 77 acre parcel of M-2 land, the central 27 acres of which belonged to the Company. About one-half mile to the southeast an 80 acre tract was placed in the M-1 (light industrial) classification. As the trial judge, Mackey, J., put it, "otherwise all of the area for several miles in every direction * * * [was] zoned Residential with the exception of one small area zoned Forest and Recreational. The area immediately adjacent to the paper plant on all sides * * * [was] zoned for the lowest density of residences (R-1)." In 1966 the Company bought the Jarvineen tract. In March 1968 it bought the Blevins tract and in April 1968 it filed applications with the County Commissioners for the reclassification to M-2 of nearly all of those portions of both tracts still remaining in the R-1 classification. The reason given for the requested change was the "need for normal expansion of paperboard mill — storage of wood, storage ponds and other uses—original zoning mistaken and character of neighborhood changed." At the hearing before the Commissioners on 23 April 1968 counsel said that to "keep pace" with developing techniques in the industry the Company found it necessary to abandon waste paper as a raw material and resort to the use of wood pulp. The new process was discussed in detail by counsel, officials of the Company and the Commissioners. A representative of the "Anti-Pollution League" was present. He said he was not against the granting of the application; he just did not "want any problems with pollution." There follows a portion of the statement made by counsel:

> "That doesn't give any odor, and the—what we wanted when this was originally zoned, there wasn't, *I think, I think there was a mistake in that.* The mill had no room to expand. The pulp thing is on the north side of Childs Road. We want the wood, a good deal of it, to be in that area. We have asked to have rezoned that part in blue, well it is the green there. We have left

one hundred feet buffer there. The use will be storage of wood and occasionally some spraying. We expect to move spraying on south onto the Blevins property. That is the thing in a nutshell, to the extent we are enlarging. *It is a change in the character of the neighborhood.* There is an M-1 on the lower right-hand side on the Vlamis property. You have the Kennedy Highway. *That has changed the character of things.*" (Emphasis added.)

Nowhere in the record will there be found any other or further mention of either mistake or change. Immediately following the hearing the commissioners unanimously approved "both applications as requested as there was a mistake in the original zoning inasmuch as insufficient land was reserved for plant expansion." It was noted that "no one appeared to protest."

On 22 May the appellees filed their bill of complaint in the Circuit Court for Cecil County citing the failure of the zoning ordinance to provide for an appeal, alleging that the action of the commissioners was "illegal, arbitrary, discriminatory and capricious" and seeking injunctive relief. The case came on for trial before Judge Mackey on 10 September. All of the appellees gave testimony; the Company offered none. The testimony of the appellees was devoted almost exclusively to the offensive odors emitted by the Company's "cooker" and the alleged diminution in the value of their respective properties.

The Company challenged the standing of the appellees to maintain the action on the grounds that none of them had been present at the hearing before the County Commissioners and since none of them had shown any damage special to himself, none of them could be classed as an aggrieved person. Judge Mackey concluded that they were aggrieved persons, that their failure to appear at the hearing did not matter and that they had sufficient standing to maintain the action. Since his decision in that regard has not been challenged in this Court, it is un-

necessary for us to give it further consideration. He concluded also that the commissioners did not have before them any evidence sufficient to make the questions of mistake or change fairly debatable; with this conclusion we agree.

We have said many times that our function is not "to zone or rezone but only to determine whether the legislative body has properly applied the law to the facts." But we have said also that "when there is no basis for reasonable debate or there are no supporting facts in the record," we ought to "declare the legislative action to be arbitrary, capricious, discriminatory or illegal." *Mayor and City Council v. NAACP,* 221 Md. 329, 334 (1960). In respect of piecemeal zoning, we said in *Wells v. Pierpont,* 253 Md. 554, 557 (1969) :

> "It is now firmly established that there is a strong presumption of the correctness of original zoning and of comprehensive rezoning, and that to sustain a piecemeal change therefrom there must be produced strong evidence of mistake in the original zoning or comprehensive rezoning or else evidence of substantial change in the character of the neighborhood. *Minor v. Shifflett,* 252 Md. 158 (1969), and the cases therein cited; *Randolph Hills, Inc. v. Whitley,* 249 Md. 78 (1968) ; *Woodlawn Area Citizens Ass'n v. Board,* 241 Md. 187 (1966). And, of course, the burden of proof facing one seeking a zoning reclassification is quite onerous. *Agneslane, Inc. v. Lucas,* 247 Md. 612, 618 (1967), and the cases therein cited."

The Company and the commissioners argue that:

> "It is certainly not unreasonable to conclude that in the original classification of the M-2 Zone around a 126 year old mill that required a good water supply, *the planners should allow for a reasonable area of expansion* in accor-

> dance with changes that might occur in opera-
> tions, either by way of normal growth, changed
> production techniques, or more intense usage,
> and that in fact as a matter of hindsight, they
> have misjudged the situation." (Emphasis
> added.)

Whatever merit this argument might have in other con-
texts, it fails of persuasion here. It will be recalled that
the commissioners placed more than the Company's 27
acres in the M-2 classification when the comprehensive
zoning ordinance was adopted in 1962. They included 20
acres belonging to Jarvineen and 30 acres belonging to
Blevins. Obviously the extra 50 acres was almost double
the 27 acres that had sufficed the Company for more than
a century. Even counsel for the Company conceded that
the additional 50 acres was "by way of anticipation per-
haps" of possible future expansion. What we are urged
to say here is that the commissioners' failure to allow
*eight times* as much area for expansion was enough of a
mistake to satisfy the requirements of the change-mis-
take rule.

The Company argues that its interpretation of the
mistake-change rule is supported by our decisions in
*Pressman v. Mayor and City Council,* 222 Md. 330
(1960), *Rohde v. County Board of Appeals,* 234 Md. 259
(1964), and *Jobar Corp. v. Rodgers Forge Community
Ass'n, Inc.,* 236 Md. 106 (1964). In *Pressman,* a 1931
comprehensive zoning ordinance provided for commercial
strip zoning along Reisterstown Road limiting the depth
of commercial establishments to 150 feet. About 27 years
later rezoning from residential use was sought for the
Reisterstown Plaza shopping center. A depth greater
than 150 feet was needed for the stores and surround-
ing parking area. We agreed that the failure of the zon-
ing ordinance to anticipate the need for or trend toward
shopping centers "* * * should be regarded as an error
in original zoning or the result of changed conditions."
*Id.* at 339. We noted that "strip zoning" according to
the experts "* * * is no longer considered good zoning.

The actual development [we said] in the neighborhood of the subject properties, as shown in this case, seems to confirm expert views. As a matter of history, zoning has preceded planning in Baltimore, and no land use master plan for the city has been promulgated." *Id.* at 337. The difference between *Pressman* and the instant case is readily apparent. Here the 1962 ordinance provided for reasonably foreseeable industrial growth. The 1931 ordinance in *Pressman* had not anticipated any trend toward more space for commercial establishments. Here planning preceded zoning; it was the other way around in *Pressman*.

The same distinction can be made in *Rohde*. There the reclassification from R-6 (residence-one or two family) to R-A (apartments) of a 37 acre tract with a special exception allowing two high rise buildings was sought. The application was granted and we affirmed. Chief Judge Brune, for the Court, noted the difficulty of characterizing the evidence as showing either a mistake in the original zoning or a change in the character of the neighborhood, "or both." He pointed out that:

"* * * either as a result of lack of anticipation of trends of development in 1955 or as a result of changes in trend which have occurred since then, whether anticipated or not, the existing zoning was in error at the time of the hearing. The trend has been towards apartments and, particularly in areas close to the City of Baltimore, towards high rise apartments. The need and demand for such rental accommodations have increased greatly over the last several years, and the subject property is described as a prime site for apartment development, including high rise apartments." *Id.* at 267-68.

Judge Brune also noted the increase in sewerage facilities since the 1955 zoning. It is apparent that the Baltimore County ordinance in *Rohde*, like the Baltimore City ordinance in *Pressman*, did not allow for any change,

whether foreseeable or not. Moreover there had been, in *Rohde,* a substantial change in the character of the neighborhood subsequent to the 1955 ordinance. Not only were high rise apartments being built to accommodate those who wanted to live close to the city but it also appeared that sewerage facilities had increased sufficiently to accommodate the proposed construction. Moreover, the change sought in *Rohde* was not from a residential use to a heavy industrial use, as in the case at bar; the change sought was from a low density residential use to a higher density use.

The Company seems to find comfort in *Jobar, supra,* but we think it rather fortifies Judge Mackey's conclusion. There the reclassification of a 6.14 acre tract from R-6 (individual or semi-detached homes on lots not less than 10000 sq. ft.) to R-A was sought. At the first hearing the Board of Zoning Appeals denied the application and refused to consider evidence offered by the applicant of changes forecast for the surrounding area such as the construction of a hospital and a medical center. The court remanded the case to the Board for further testimony. One of the grounds for the appeal to this Court was that the remand was improper. Judge Prescott (later Chief Judge) pointed out that:

> "* * * in order to show a change in conditions, as was stated by Chief Judge Brune in *Rohde v. County Board,* 234 Md. 259, when quoting from *Trustees of McDonogh, etc. v. Baltimore County,* 221 Md. 550, *the Board was entitled to consider (and therefore the applicants for reclassification were entitled to present) projects that were 'reasonably probable of fruition in the foreseeable future.' And the same rule applies, we think, when an applicant attempts to prove an error in original zoning.* The Board, at its first hearing, was too restrictive in not permitting the applicants to produce evidence of the hospital projects which were reasonably

probable of fruition in the foreseeable future; hence the Board's decision was not 'in accordance with law,' and the judge was warranted, under the provisions of law mentioned above, in remanding the case for the taking of additional testimony." *Id.* at 112. (Emphasis added.)

It is not possible to find in this record anything to support the argument that the commissioners did not consider changes which were "reasonably probable of fruition in the foreseeable future." We think they were considered; we think adequate provision was made for them. *Trustees of McDonogh Educ. Fund & Inst. v. Baltimore County,* 221 Md. 550 (1960), according to the Company, illustrates the principle that mistake can be based on inadequate planning for future uses. But, as we have said, there is no evidence in this record of inadequate planning. The provision for an additional M-2 area, nearly twice the size of the Company's then existing site, seems to us to be adequate future planning.

Finally, the Company asserts that *Hoffman v. City of Baltimore,* 197 Md. 294 (1951), and *Dill v. Jobar Corp.,* 242 Md. 16 (1966), are "* * * undoubtedly an application of the 'mistake' rule, as discovered through 'hindsight.' " In *Hoffman* (which did not involve an application of the mistake-change rule) we overturned the denial of a special exception to an applicant who wanted to use a portion of a lot zoned residential for the storage of building materials. The unsuitability of the land for residences and the fact that the surrounding residences would not be injured by the granting of the special exception were noted. The Court pointed out that in the 20 year period that had elapsed since the land was zoned the tract had "* * * never been used for residential purposes and there is no evidence that it will ever be [so] used * * *. * * * The special hardship in the prohibition of a use here justifies an exception from the general restriction." *Id.* at 304-05. *Hoffman* is clearly distinguishable from the case at bar. While the vicinity in

*Hoffman* was found to be "primarily industrial," here the vicinity is primarily agricultural and residential. Moreover, both the Jarvineen and Blevins tracts have always been used for residential and farming purposes. Although, as the Company points out, those tracts, because of their location, could be used more profitably if devoted to industrial uses, this does not demonstrate their unsuitability for residential uses. *See Hunter v. Board of County Comm'rs,* 252 Md. 305, 310 (1969); *Helfrich v. Mongelli,* 248 Md. 498 (1968). It is worth noting that, at the hearing before the Board, counsel for the Company offered the following observation in respect of the residential suitability of the Blevins "tract."

> "(Mr. Constable) The mill recently bought Mrs. Blevins' entire lot and left a life estate in it for her to live there the rest of her life. *Somebody last week wanted to buy the house already* and it's in bad shape." (Emphasis added.)

The dissimilarity between the instant case and *Dill v. Jobar Corp., supra,* is also apparent. The applicant in *Dill* had obtained a rezoning to M-R (manufacturing-restricted) in 1961 and, while an appeal was being taken, a new comprehensive map was adopted which placed the area in question in the R-A classification. Moreover, it appeared that the planning office had recommended M-R zoning for the applicant's tract; however, the county council classified it R-A, intending it to be a transitional or buffer zone. In view of the planning board's recommendation and the land's special suitability for M-R use, we found strong evidence of mistake in the original rezoning. In the case before us, while the Proposed Master Development Plan suggests that a portion of the area has an "industrial potential," there is no recommendation that it be changed to M-2 nor is it suggested that the land is unsuitable for residential use.

We might add also to the cases discussed above our recent decision in *Hunter v. Board of County Comm'rs, supra.* In that case the applicant sought the reclassifica-

tion of 150 acres from "A" (agricultural) to I-G (general industrial district). The property and the area surrounding it, having always been used for farming, was classified "A" by Carroll County's first comprehensive zoning ordinance in 1965. The stated purpose of the rezoning was to allow the construction along the railroad of a plant to manufacture clay tile products. The application was approved and, upon appeal, the trial court affirmed on the ground that the mistake-change rule had been satisfied. Judge Finan reviewed the lower court's reasons for finding mistake and change. It seems the Planning Commission had determined that the area was desirable for industrial use although it had recommended the "A" classification because of a lack (at the time) of public utilities. The trial court found this determination to be in error because, at the time the ordinance was passed, there had been a proposal for the extension of a natural gas pipeline from Pennsylvania to Maryland. Moreover, the trial court felt that there were other facilities that were "more than adequate" to support an I-G classification. The court also felt that the presence of shale in the area should have a bearing on the issue of original mistake. In reversing the lower court Judge Finan, for this Court, pointed out that:

> "Certainly, the decision of the legislative body in adopting a comprehensive plan, to exclude industrial zoning in a traditionally agricultural area, cannot be said to have been a mistake, because of the possibility of the adaptability of the farm land to industria! use, the later promise of a gas line for indust::ial use and shale deposits becoming available in another part of the county.
> "There was really no evidence as to mistake or error in the original comprehensive zoning ordinance, other than the bland conclusions contained in the report of the Planning Commission's staff, which were incorporated into the court's opinion." *Id.* at 310.

The similarity between *Hunter* and the case before us is apparent. Both the Carroll County and the Cecil County planning commissions had determined that the respective areas were available for industrial use prior to the enactment of the comprehensive zoning ordinances. Nevertheless, both ordinances classified the tracts so as to continue the existing uses. Furthermore both here and in *Hunter* error in the comprehensive ordinance was claimed because of a failure to anticipate "things to come." In *Hunter* it was argued that the mistake was a failure to foresee that a natural gas pipeline would be extended to the area in question from Pennsylvania.

The Company claims also that there has been a substantial change in the character of the neighborhood since the enactment of the 1962 ordinance, pointing to the Kennedy Highway, the main line of the B & O Railroad and the 80 acre tract classified M-1 in 1962. We agree with Judge Mackey that:

> "* * * [no] extended discussion [is] needed to conclude that the presence of the Expressway (which was nearing physical completion at the time of the original zoning) or the Railroad (in place for at least a century) or the Light Industrial area fail to raise any debate at all as to either change in the neighborhood or error in the original zoning."

In conclusion, it seems appropriate to repeat what Judge Finan said, for the Court, in *Helfrich v. Mongelli, supra*:

> "Undoubtedly, the appellees would enjoy a greater economic gain from the sale or use of the property under an R-A classification; however, this Court has repeatedly held that the fact that rezoning may result in the realization of greater profits from use of the land or that hardship may follow from the retention of the

existing classification is not sufficient justifica-
tion for rezoning." *Id.* at 502-03.

> *Order affirmed.*
> *Costs to be paid by the appel-
> lants.*