## JAMES D. QUINN *v.* COUNTY COMMISSIONERS OF KENT COUNTY ET AL.

[No. 355, September Term, 1973.]

*Decided March 11, 1974.*

414

The cause was argued before ORTH, C. J., and MOYLAN and MENCHINE, JJ.

*Leonard E. Wilson,* with whom were *Wilson & Lidums* on the brief, for appellant.

*A. Parks Rasin, Jr.,* and *Floyd L. Parks,* with whom was *Ernest S. Cookerly* on the brief, for appellees.

MENCHINE, J., delivered the opinion of the Court.

Piecemeal rezoning of land from commercial to residential use is of signal rarity. This is such a case.

The "blessings and the burdens" of *Village of Euclid v. Ambler Realty Co.*[1] came late to Kent County. Original zoning came in 1960; comprehensive rezoning in 1969. The subject appeal attacks the validity of piecemeal reclassification in 1972 of lands zoned B-1 (Neighborhood Business) to R-1 (Single Family Residential).

We reproduce partially Map No. 7 of the 1969 comprehensive rezoning of the area, whereby the subject land (shown cross-hatched) had been placed — for the first time — in a commercial zoning classification.

---

[1] 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303. This 1926 decision of the Supreme Court of the United States widely is regarded as placing the imprimatur of constitutional validity on ordinances restricting the use of land. See: Rathkopf: *The Law of Zoning and Planning,* Vol. 1, Ch. 1-2; Yokley: *Zoning Law and Practice,* 3rd Ed., Vol. 1, Sec. 1-8; Metzenbaum: *Law of Zoning,* 2nd Ed., Vol. 1, p. 56. The Supreme Court in *Euclid* cited *Goldman v. Crowther,* 147 Md. 282, 128 A. 50, as announcing the contrary view. In *Goldman,* a divided Court, speaking through the late Judge T. Scott Offutt, had declared (P. 309, [60]): " * * * so much of the ordinance as attempts to regulate and restrict the use of property in Baltimore City is void: * * * " In 1927 the Court of Appeals in *R. B. Construction Co. v. Jackson,* 152 Md. 671, 137 A. 278, (Offutt, J., then dissenting) bowed to the ukase of *Euclid, supra,* the Court saying at page 674 [280]: "In this case there is a conflict between a private property right and the desire of a great city to regulate its own growth. The property right should be protected against any unwarranted invasion, but it should not be permitted to defeat legislation enacted by the city within the limits of its police power for the general benefit of its inhabitants."

The legal war between "private property rights" and the "general public welfare" at constitutional level had ended. The almost countless skirmishes at procedural and factual levels had begun.

The County Commissioners of Kent County, acting under its statutory power to rezone, granted the application restoring to the tract the residential classification that was its zoning before the 1969 ordinance. The Circuit Court for Kent County affirmed that decision. This appeal by a property owner affected by the change contends that the evidence produced before the County Commissioners was insufficient to permit piecemeal reclassification. He maintains that neither change of conditions nor original mistake in the B-1 zoning classification had been shown.

Appellees concede that there is no change in the area such as would permit or justify reclassification. They urge, however, that the evidence shows beyond question that the zoning classification B-1 applied to the subject tract in 1969 was the product of manifest error or mistake.

It will be observed that the property in question has a frontage of about 750 feet on the east side of Route 213, with an irregular depth ranging between 135 to 150 feet. The B-1 zoned area extends south from the Sassafras River. It is carved from and is bordered on the east by residential zoning for thousands of feet.

Route 213, in its course south from the Sassafras River rises precipitously, peaking at or near the southernmost line of the west side commercial zoning. From that point, a reverse slope carries Route 213 toward the town of Galena, about one mile away.

At the northeast and northwest corners formed by the bridge crossing the Sassafras River (both in Cecil County) are respectively, a restaurant known as "The Granary" and the Sassafras Boat Company. The southwest corner (in Kent County) is now and originally was zoned as a "Marine District" and principally is occupied by the Georgetown Yacht Club. The west side of Route 213, running south from the Marine District is now and originally was zoned B-1. That B-1 zoned area extends from the Georgetown Yacht Club and Marina on the north to the Kitty Knight House, a restaurant, on the south. Between the termini of west side B-1 zoning one finds unimproved vacant land with road frontage of 400 feet to a depth of 120 feet. No part of that

B-1 reservoir has been utilized for commercial purposes in the nine years between original (1960) and comprehensive (1969) rezoning. Witnesses said this tract provided "plenty of area * * * for such [commercial] development."

The reclassified area encompasses eight separate individual ownerships. All eight properties in 1960 were and are improved by substantial dwellings. Two of the properties are utilized for marginal commercial purposes, consisting of an antique shop antedating original (1960) zoning (whose owner joined the petition for reclassification) and a "gold fish operation * * * of a miniature nature." Both businesses are conducted within the original residences. Curiously, none of those eight owners, whether friend or foe of the subject reclassification, was aware that his property had been placed in B-1 zoning classification until shortly before the filing of the requested change in classification. Five of those owners favored return to residential zoning. Three were said to support retention of the B-1 zoning. This circumstance, of course, is without legal effect. The cases make clear that "A plebiscite of the neighborhood does not determine zoning." *Montgomery County Council v. Scrimgeour*, 211 Md. 306, 313, 127 A. 2d 528, 532.

The appellant was the only protestant to testify. An owner of one of the reclassified properties, he did not dispute any of the facts recited by the fourteen witnesses who appeared and testified in favor of the proposed reclassification to residential. He expressed the belief that the change from B-1 to R-1 classification would lessen the value of the property because "as a piece of rental property for a residence being as near as it is to the bridge, and noise and other things that have been brought out already, it doesn't command a very large rental." He indicated in his testimony that the owners of two other properties within the zoned area shared his views. They did not testify.

The only other evidence produced by the protestant was a letter of the Planning Commission reading as follows:

"On June 8th, 1972 the Kent County Planning Commission met and examined application ZMA 12

as submitted by several residents of Georgetown requesting a zoning reclassification on Zoning Map 7. A substantial change in the area or a mistake in the original zoning are the criteria for rezoning as spelled out by Article 66B, Maryland Planning and Zoning Enabling Act. Neither change nor mistake have been evidenced in the area in question. Therefore, in the absence of justification for rezoning the Kent County Planning Commission does not recommend approval of application ZMA 12."

No reasons for the stated recommendation were given by the Planning Board.

Following *Northwest Merchants Terminal v. O'Rourke*, 191 Md. 171, 191, 60 A. 2d 743, 753 (change) and *Kracke v. Weinberg*, 197 Md. 339, 347, 79 A. 2d 387, 391 (mistake), Maryland developed what has come to be called the "change-mistake rule" to test the propriety *vel non* of piecemeal zoning reclassifications. That rule now is firmly fixed in Maryland law and was thus stated in the recent case of *Stratakis v. Beauchamp*, 268 Md. 643, 652, 304 A. 2d 244, 249:

"Where a legislative body, or a board of county officials, pursuant to authority conferred upon it, has granted a rezoning of property, the question on judicial review is whether or not such action is arbitrary and discriminatory or fairly debatable, *Montgomery County v. Pleasants*, 266 Md. 462, 295 A. 2d 216 (1972); *Himmelheber v. Charnock*, 258 Md. 636, 267 A. 2d 179 (1970); *Chevy Chase Village v. Mont. Co.*, 258 Md. 27, 264 A. 2d 861 (1970); *Smith v. Co. Comm'rs of Howard Co.*, 252 Md. 280, 249 A. 2d 708 (1969). We shall follow that test in considering this appeal.

While, in recent years, we have had occasion to enunciate a number of important principles applicable to the law of zoning, perhaps none is more rudimentary than the strong presumption of

the correctness of original zoning and of
comprehensive rezoning. To sustain a piecemeal
change in circumstances such as those present here,
*strong* evidence of mistake in the original zoning or
comprehensive rezoning or evidence of substantial
change in the character of the neighborhood must
be produced, *Mayor and Council of Rockville v.
Henley,* 268 Md. 469, 302 A. 2d 45 (1973); *Heller v.
Prince George's Co.,* 264 Md. 410, 412, 286 A. 2d 772
(1972); *Creswell v. Baltimore Aviation,* 257 Md. 712,
721, 264 A. 2d 838 (1970). Since, as we have also
said, this burden is onerous, *Cabin John Ltd. v.
Montgomery Co.,* 259 Md. 661, 271 A. 2d 174 (1970);
*Creswell v. Baltimore Aviation, supra; Wells v.
Pierpont,* 253 Md. 554, 253 A. 2d 749 (1969), the task
confronting appellants, whose application followed
the comprehensive rezoning by merely four
months, is manifestly a difficult one."

Determination of the subject appeal, accordingly, turns
upon a consideration of the facts presented to the County
Commissioners as tested by that rule of law.

The unincorporated village of Georgetown was described
as extending southerly for one-half mile along Route 213
commencing at the Sassafras River bridge. It is said to have
a population of 71 persons.

One witness described it as "an historical spot, preserved
buildings — you can't get them back once they are destroyed
and gone, it's all over you know."

A nearby resident, who had been a member of the
Planning and Zoning Commission of Greenwich, Connecticut
before moving to Maryland, testified that the zoning of the
tract should be returned to residential classification. He
maintained that the substantially undisputed facts
demonstrated clear error in the 1969 rezoning. He pointed
out:

(a) that both boat yards at the bridge crossing
had elaborate shopping centers;

(b) that the town of Galena, within a mile of the

subject tract, "have practically every type of service that you need;"

(c) that all separate ownerships within the commercially zoned area were improved with substantial dwellings, saying "you ought to remember, all of these houses are there now — they are homes, and I can't understand — it must have been a colossal mistake when in 1969 they just decided to go across the street there. The road is a perfectly good buffer for that B-1 zone."

(d) that motor vehicles approaching the area from south to north "get exactly down to this spot, with a complete blind spot as far as what you can see below. * * * [P]eople suddenly come over that crest and then they are going down hill * * * [N]ow if you had business on the righthand side of that road, in the narrow area, I think that it creates a real traffic hazard. This is not an imaginary thing, it is a real thing, that traffic hazard."

(e) that properties within the area would suffer depreciation in value if the commercial zoning remained.

One witness said: "If you go commercial you have got to get rid of the trees, you have got to get rid of the hedges, the houses, and you have to get rid of the people."

Another witness, making reference to the vacant B-1 land on the west side of the highway said: "The point is, it is almost ludicrous to consider that there is an area which is virtually identical in size * * * there isn't a building on it. Why, then do we take the word commercial and put it here when it has already been established and accepted on this [other] side? * * * don't bulldoze these charming houses down. Don't destroy the charming little community."

Another said: "I can't believe anything other than when this was rezoned someone looked at the map and said, there is a river there, and there is four corners, why don't we put commercial there and call this commercial. I don't think they are on the spot at all. I don't care if he came from

Baltimore, or New York, if he was in his right mind he couldn't say that that was commercial when you look at those houses."

A witness who was a real estate broker, and a lifetime resident of the area, testified that the subject tract contained "very valuable old homes," the value of which would be depreciated if the B-1 zoning classification was retained.

Another said: "Gentlemen, this area is a residential area, and has been a residential area for over 200 years. Even after the British burned Georgetown in 1812, the residents rebuilt on those same sites, since they were of the opinion, as their forefathers, that this was a residential area."

Photographs of the residences offered mute but graphic confirmation of the witnesses' descriptive words.

Other testimony related to traffic hazards incident to commercial zoning.

(a) That Route 213 at the southern end of the B-1 zoning is narrow, with "hardly room for two cars to pass."

(b) "I think there is a definite traffic hazard."

(c) "It is almost like a tunnel — you know, going from the top of the hill, because * * * there's a stone wall on one side * * * and then there is a bank by the Kitty Knight House, and then that goes straight down and across the bridge, and of course the bridge is confined too, and it is so unbelievably dangerous."

(d) That although a sign on the highway indicates a "school bus stop," the bus does not stop there "because it is not safe for the bus to stop on 213 * * * because the traffic coming over the hill could never stop * * *."

(e) That "there are blind spots on both sides, but particularly on the right side * * * going north, I watch people come out of their driveways and they almost tremble — you can see the expression of almost fear as they look out and wonder — 'Can I make it now?'"

It was pointed out that the properties on the east side of Highway 213 "are of irregular depth and some of them could

still be part residential and part commercial. They are not uniform in any way, yet the [zoning] line apparently shows a uniform parallel line * * *." .

The appellant has cited many cases suggested as supporting his appeal. These cases are: *Zang & Son v. Taylor,* 203 Md. 628, 102 A. 2d 723; *American Oil Co. v. Miller,* 204 Md. 32, 102 A. 2d 727; *Baltimore v. NAACP,* 221 Md. 329, 157 A. 2d 433; *Shadynook v. Molloy,* 232 Md. 265, 192 A. 2d 502; *Greenblatt v. Tony Schloss Properties,* 235 Md. 9, 200 A. 2d 70; *MacDonald v. County Board,* 238 Md. 549, 210 A. 2d 325, *Miller v. Abrahams,* 239 Md. 263, 211 A. 2d 309; *Mack v. Crandell,* 244 Md. 193, 223 A. 2d 248; *France v. Shapiro,* 248 Md. 335, 236 A. 2d 726; *Smith v. Board,* 252 Md. 280, 249 A. 2d 708; *Brenbrook Const. Co. v. Dahne,* 254 Md. 443, 255 A. 2d 32; *Westview Park Improvement Ass'n v. Hayes,* 256 Md. 575, 261 A. 2d 164; *Creswell v. Baltimore Aviation,* 257 Md. 712, 264 A. 2d 838, and *Stratakis v. Beauchamp, supra.*

Brief quotations from those cases demonstrate that they do not support appellant's contention.

*Stratakis, supra,* because the evidence consisted of "bald allegations * * * unsubstantiated by facts." (P. 653 [249]);

*Creswell, supra,* because the evidence consisted merely of an opinion "that one or more lines should have been drawn slightly to the east, the west, the north, the south * * *." (P. 722 [843]);

*Westview Park, supra,* because the evidence consisted of "an unsupported conclusion." (P. 581 [167]);

*Brenbrook, supra,* because "there [was] no legally sufficient evidence of original mistake * * *" (P. 450 [36]);

*Smith, supra,* because the only testimony as to mistake was the statement of a realtor that " * * * I would tend to think that there was a slight mistake when the Zoning Map was adopted * * *." The Court of Appeals commenting further that the witness "did not present such strong supporting facts other than stating that the property 'is a corner property and there is a lot of traffic at that intersection, there is also a good sight distance both ways * * * '." (P. 284 [710]);

*France, supra,* where the only evidence of mistake was a suggested failure to provide for apartment zoning, and where cross-examination indicated that the area's population had increased only modestly and showed that substantial apartment development had already occurred or was in prospect. (P. 345 [732]);

*Mack, supra,* because "The Board's action [was] * * * not to correct an error, but to rezone the property for a use inconsistent with the original comprehensive zoning." (P. 197 [250]);

*Miller, supra,* because the Court's consideration of a totality of the evidence caused "Our conclusion [to be] metaphorically illustrated by the simple arithmetical computation that zero plus any number of additional zeros still equals zero. As the evidence * * * was too thin to make the issue of mistake fairly debatable, it rendered [the Board's] action arbitrary and capricious in a legal sense; * * *." (P. 275 [315]);

*MacDonald, supra,* because appellant "claimed but offered no evidence to support a mistake in the Master Zoning Map." (P. 553 [327]);

*Greenblatt, supra,* because "the most that the applicant * * * showed * * * was that the drainage course would be a logical place to draw the line * * * but this does not mean that it was then error in a legal sense to have used the property line." (P. 13 [73]);

*Shadynook, supra,* because the evidence showed "that the rezoning of the subject property as R-A would create the entering wedge of such zoning" in the area. (P. 273 [506]);

*Baltimore v. NAACP, supra,* because "there was no proof of a basic mistake." (P. 335 [436]);

*American Oil, supra,* because the reasons given for reclassification "are not supported by the facts in the case." (P. 44 [733]); and

*Zang, supra,* because "The Courts review the action, not the opinion, of the Commissioners. *Williams v. McCardell,* 198 Md. 320, 330. The reasonableness of such a resolution is to be determined by the facts from which the conclusion is

drawn, rather than from the conclusion itself." (P. 636 [727]).

*Jobar Corp. v. Rodgers Forge*, 236 Md. 106, 202 A. 2d 612; *Dill v. Jobar Corp.*, 242 Md. 16, 217 A. 2d 564; and *White v. Board of Appeals*, 219 Md. 136, 148 A. 2d 420, also cited by appellant, tend to reject rather than to support his position. In all three, reclassifications grounded upon mistake were sanctioned. In *Jobar, supra,* the trial court was reversed and the Board's reclassification restored because the evidence of mistake had been at the very least "fairly debatable."

The Court of Appeals has made plain that the actual existence of residences upon property is an element of importance for consideration by zoning authorities before commercial zoning is applied. *County Council v. Gendleman*, 227 Md. 491, 498, 177 A. 2d 687, 690, 691.

Traffic conditions may be material factors in zoning. *Temmink v. Board of Appeals*, 212 Md. 6, 128 A. 2d 256; *Bigenho v. Montgomery County*, 248 Md. 386, 394, 237 A. 2d 53, 58.

The Court of Appeals has noted [2] that zoning experts now reject the idea that "strip zoning" is "good zoning." The shoddy vestiges of an earlier, contrary expert view, offend the eye in almost every village, town and city in the State.

The County Commissioners clearly were entitled to consider the fact that the vacant B-1 land on the west side of the highway was still undeveloped twelve years after original zoning. *County Commissioners v. Edmonds*, 240 Md. 680, 689, 215 A. 2d 209, 214.

A factor of importance in our review is the fact that the County Commissioners granted the reclassification. In *Board of County Commissioners v. Meltzer*, 239 Md. 144, 210 A. 2d 505, the Court of Appeals stressed the difference, on appellate review, between cases wherein the trial court had sustained the responsible zoning authority and those in which that body had been reversed, saying at page 155 [511]:

"There is a marked difference between the changes

---

**2.** *Pressman v. Baltimore,* 222 Md. 330, 337, 160 A. 2d 379, 382; *County Comm'rs v. Phillips,* 255 Md. 229, 234, 257 A. 2d 158, 161.

which will *justify* a reclassification * * * and those which *impel* one." [Italics supplied]

That principle was explained thus in *Dill v. The Jobar Corporation, supra,* at page 23 [568]:

"Even though the existing zoning does not result in confiscation and thus *require* rezoning, original error may *permit* the agency to which the controlling legislative body has entrusted individual rezoning properly to change a classification, *Overton v. Co. Commissioners,* 225 Md. 212, if it does so on evidence before it which is substantial enough to permit reasoning minds reasonably to conclude that the strong presumption of the correctness of the original zoning or comprehensive rezoning has been overcome."

Appellant suggests that the case is controlled by the line of cases collected and discussed in *Polinger v. Briefs,* 244 Md. 538, 541, 224 A. 2d 460, 461. *Polinger* reaffirmed the broadly recognized principle that zoning authorities will not be permitted to grant rezoning where it has been denied or to deny rezoning where it has been granted because of a "mere impermissible change of mind or heart." We do not deny the validity of, nor retreat from, that principle. The postural circumstances of *Polinger,* and the cases it cites, indeed demonstrate the true basis for its comment and illustrate the enormous factual differences between those cases and the subject case.

In *Kay Construction Co. v. County Council,* 227 Md. 479, 177 A. 2d 694, the Court of Appeals *restored* a rezoning *reclassification* granted by the County Council in November, 1959, that it attempted on March 1, 1960 to revoke after a change of council membership. The Court of Appeals observed at page 489 [700]:

"It is apparent that the Council's 'plain and simple error of judgment' was in reality a mere change of mind, a shift of majority opinion occasioned by the substitution of a councilman of

one conviction for a councilman of another conviction."

Again, in *Schultze v. Montgomery County Planning Board*, 230 Md. 76, 185 A. 2d 502, the Court of Appeals *restored* validity to a development plan initially approved, later conditionally disapproved, and finally disapproved entirely by the Planning Board. The Court said at page 81 [505]:

" * * * the disapproval of the final plan amounted to a mere change of mind on the part of the board as it is apparent from the record that it was not founded upon fraud, surprise, mistake or inadvertence, or indeed upon any new or different factual situation."

In *Alvey v. Hedin*, 243 Md. 334, 221 A. 2d 62, the Court of Appeals denied to one who had unsuccessfully raised the question of a mistake in original zoning, the right to do so a second time on the identical evidence.

In *Chatham Corp. v. Beltram*, 243 Md. 138, 220 A. 2d 589, denial of a petition for rezoning was affirmed by court decision. A year later reclassification of the same property was granted by the zoning authorities. The Court of Appeals reversed, saying at page 152 [597]:

"We think it plain that the first judicial decision was *res judicata* and prevented the second action of the Commissioners unless the second proposal of Chatham was not the same or substantially the same as the first, and we cannot agree with the Commissioners and Chatham that the second application was essentially different from the first."

*Mettee v. County Commissioners of Howard County*, 212 Md. 357, 129 A. 2d 136, factually is, so different from cases involving application of the "change or mistake" rule that it furnishes no useful test in the subject case.

In *Mack v. Crandell, supra,* where the suggested error in original zoning was held not to have been sufficient to

justify reclassification, the Court was careful to point out at page 199 [251]:

"Our holding in this case does not attenuate the firmly established principle that administrative orders in zoning matters, in general, are not to be reversed unless they are arbitrary, capricious or unreasonable. Nor does our holding disturb the rule that, while there is a *strong presumption* of the correctness of *original zoning* or rezoning, *reclassifications may be upheld* if there is strong evidence of original mistake * * *." [Italics supplied]

In *Daihl v. County Board of Appeals*, 258 Md. 157, 165, 265 A. 2d 227, 231, the Court of Appeals, although rejecting reclassification, made clear that original mistake will be determined by viewing the totality of the evidence after giving recognition to the strong presumption of correctness attaching to original zoning, citing *Dill v. Jobar, supra*, and *Overton v. County Commissioners*, 225 Md. 212, 170 A. 2d 172. This is a far, far different rule than appellant suggests namely, that an original zoning classification, however unwise, unwarranted, unreasonable and unjust it may be as applied to a particular area, is beyond the reach of legislative correction. We do not so read the Maryland decisions.

The case most clearly demonstrating that the subject case does not fall within the rule of *Polinger, supra*, is *Overton v. County Commissioners, supra*. There, comprehensive zoning imposed in 1957 was reclassified in 1959. The Court of Appeals pinpointed the issue before it by saying at page 215 [173]:

"In our view of this case, the crucial question involved is whether a mistake was made in the original classification of the subject property, * * *"

The Court then went on to state at page 219 [176]:

"It is obvious in the instant case that there was

ample evidence before the legislative body from which it could find mistake in the original comprehensive zoning. The Council *could have given weight to the testimony of the real estate experts that difficulties of terrain and drainage made the property unsuitable for detached dwellings* and that low density apartments appeared to be the best feasible use. *Kracke v. Weinberg*, 197 Md. 339, 79 A. 2d 387 (1951). The *Council may have determined, from all of the evidence before it, that the reclassification would bear a substantial relationship to the public health, safety and general welfare, and would be more in harmony with the comprehensive zoning plan than the original classification.* [Italics supplied]

It is, of course, instantly apparent that terrain and drainage difficulties applicable to that land necessarily were precisely the same in 1959 as they had been in 1957. Nonetheless, reclassification was granted *because the presumption of the correctness of original zoning had been overcome.*

In the subject case the evidence is uncontradicted that at the time of comprehensive rezoning: (a) there was no need for additional commercial zoning, (b) the particular land chosen as the site of additional commercial zoning was singularly unfit for the purpose, and (c) that significantly greater traffic hazards necessarily would be created by use of the land for that commercial purpose.

In sum, the uncontradicted evidence shows, as was the case in *Overton, supra,* that the reclassification bears a substantial relationship to the public health, safety and general welfare and would be more in harmony with the comprehensive zoning plan than the original classification.

The evidence in this record points out in scrupulous detail that application of a commercial classification to the subject tract in 1969 was improper. There was no evidence to the contrary. Under that evidence, all that was before the County Commissioners, and all that is before us, the County

Commissioners determined that the comprehensive rezoning ordinance, as applied to the subject properties, was erroneous.

Under such circumstances, we are persuaded the reclassification by the County Commissioners upon the ground of mistake was permissible. " * * * a reasoning mind could reasonably have reached the result the agency reached upon a fair consideration of the fact picture painted by the entire record." *Board v. Oak Hill Farms*, 232 Md. 274, 283, 192 A. 2d 761, 766. On such a showing the Court's "only course is to affirm." *Bonnie View Club v. Glass*, 242 Md. 46, 52, 217 A. 2d 647, 651.

With no reason assigned for the conclusion stated by the Planning Board in its letter and with the massive evidence of basic mistake in the 1969 comprehensive rezoning as applied to the subject property, we find the recommendation of the Board no more controlling here than was a similar report that was rejected as a "tinkling cymbal," in *Habliston v. Salisbury*, 258 Md. 350, 265 A. 2d 885. In *Swarthmore Co. v. Kaestner*, 258 Md. 517, 532, 266 A. 2d 341, 348, it was said:

> "We have held that the County Council is not required to follow the recommendations of the Planning Board."

Presumptions flee from facts that destroy them.

In *Mack v. Crandell, supra*, it was said at page 198 [250]:

> "The cases in which this Court has sustained an administrative order correcting a mistake clearly shown in the original zoning have been limited to the rectification of the mistake."

That is precisely the posture of the subject reclassification. The County Commissioners concluded that B-1 zoning applied to this fully improved residential area was erroneous. They restored its historic status. The evidence justified their action.

*Judgment affirmed.*
*Costs to be paid by appellant.*