## CRESWELL, ET AL. *v.* BALTIMORE AVIATION SERVICE, INC.

[Nos. 328 and 410, September Term, 1969.]

*Decided May 6, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN and SINGLEY, JJ.

*E. Scott Moore* for appellants.

*James D. Nolan* and *Newton A. Williams,* with whom were *Nolan, Plumhoff & Williams* on the brief, for appellee.

HAMMOND, C. J., delivered the opinion of the Court.

In 1956 a tract of 43 acres in the Perry Hall area of the 11th District of Baltimore County between the Belair Road and the Kennedy Expressway, an area then essentially rural, was permitted to be used as an airport by grant of a special exception. It remained a "cowfield" airport for some years used by its owner Quinn, himself a flyer, and others, spasmodically and relatively infrequently. In the 1966 comprehensive rezoning of the 11th District the airport land was put in an R. 40 zone and considerable contiguous and adjacent land of neighboring owners (predecessors in title of the appellee) and others, to the west and south, was zoned R. 20. On May 5, 1967, Quinn conveyed the airport to Baltimore Aviation Service, Inc., the appellee, which has regraded and paved the runway and plane parking area, and built hangars and a small office building. The use of the airport has increased substantially since Baltimore Aviation acquired it. This growth must have been anticipated because about a month after it acquired the property Baltimore Aviation caused to be filed a petition with the zoning commis-

sioner requesting that 6.07 acres of the R. 20 land to the west (the subject property) be reclassified to R. 40 so that a special exception could be granted to allow the 6.07 acre parcel to be used for realignment of the 2000-foot runway and its extension by 400 feet. The reclassification was an essential prerequisite to the grant of the special exception for airport use, which is permitted in an R. 40 zone but not in an R. 20 zone.

The evidence before the Board of Appeals was directed largely to the reason for seeking to enlarge the airport area and the effect of airport use on the neighborhood. After airport use was permitted in 1956, the Chapel Hill Elementary School was built to the south of the subject property. To the immediate east of the airport runs the Kennedy Expressway, built after 1956. A high tension line 100 feet high runs nearby. To the north is a development of 56 expensive homes, called Forge Heights, and next to that is Forge Acres, a development of 100 homes. The surrounding neighborhood is zoned and used primarily for residential purposes.

The testimony for the applicant on the question of the new special exception was that (1) realignment and extension of the runway were desirable for safety reasons by taking planes away from the school and the high tension wires and the nearby homes, and to enable the best use of the prevailing wind patterns (although it was admitted that the runway could be extended 400 feet within the original 43 acres and the airport as it is has met Federal and State safety standards) ; (2) the grant of the new special exception would not adversely affect either property values in or the general welfare of the neighborhood. Testimony for the protestants on this point was that the adverse effect on the neighborhood of airport use had greatly increased in recent years because of noise and disturbance amounting to a nuisance, fear of low flying planes, damage to livestock and chickens from noise and fear (the chickens laid bloody eggs).

. The zoning commissioner and the Board granted the reclassification and the special exception and the Circuit

Court affirmed the Board, although limiting the reclassification and the special exception to the area of the extension of the runway and disallowing both for the remaining part of the 6.07 acres. It appears that although the use of the original 43 acres for an airport might have been warranted in 1956 as compatible with the neighborhood, that this no longer reasonably could have been found to be so, but we do not reach the point for we find that there was no error in the comprehensive rezoning in 1966 (that there had been no change in the character of the neighborhood between 1966 and 1967 is conceded and change was not considered below) and therefore there was no basis for reclassifying the 6.07 parcel to R. 40, and as a result the absolutely necessary prerequisite for the granting of the requested special exception was completely lacking.

The testimony on error in the 1966 comprehensive zoning—in the Northeastern Area Comprehensive Zoning Map—came largely from three land planners. One, the deputy director of Planning for Baltimore County had been at the time of the planning for and adoption of the 1966 map chief of the Comprehensive Planning Division and responsible for the basic planning of the map. Prior to 1966 land to the west of the airport, then zoned R. 6 was owned by a Mr. and Mrs. Schwartz, the people who sold the 6.07 acres to Baltimore Aviation. The deputy director said that the planning board recommended to the County Council that the Schwartz land be zoned R. 20 on the new map. The reason for the recommendation was that the plan envisioned high density along Belair Road to lower densities as the airport and the Kennedy Expressway were approached, so that the zoning from Belair Road east was first R. A, then R. 6, R. 10, R. 20 and R. 40. Neither the planning board nor the County wanted to encourage enlargement of the airport and no land not previously zoned R. 40 either to the west or south was put in a category that would permit airport use. The subject property and surrounding property were zoned R. 20 because sewerage would become available within a reason-

able time—possibly five years—and it is more economic and a better public investment to develop land in less than acre lots rather than acre or larger lots. In the opinion of the deputy director the 1966 zoning was not in error.

The second expert land planner who testified for the protestants deduced from the official County report on the Master Plan for the northeast area that there will be tremendous growth in the 11th District, that it will be one of the fastest growing areas in the County and that it will increase in population from 74,000 people in 1965 to 140,000 in 1980. "This growth will happen: the challenge is to plan and guide it so good new towns can be built." This expert agreed with the deputy director, as did the chief of the sanitary sewer design group for Baltimore County that sewerage could become available to the area around the airport within five years, possibly less by reason of pressure from homeseekers and land developers. The expert concluded that the planning report reinforced his view that the definite official intent in 1966 was that "this be a highly residential, rather high-density residential area—where an intrusion of R. 40 would not be in keeping with the program." His expert opinion was that there had been no error in the 1966 map.

The testimony for the applicant as to error included that of the president of Baltimore Aviation, who said that because Baltimore County had built the elementary school near the airport it had been a mistake for the County Council not to have so zoned in 1966 as to afford ample room for improvement to the airport in the form of realignment and extension of the runway.

There was testimony that the soil and underground conditions of the subject property and the airport were such that various percolation tests had failed. The qualified land planner who testified for the applicant said that in his opinion an area bounded by the Kennedy Expressway, by the Gunpowder Falls, by Joppa Road and by Cross Road should have been zoned R. 40 in 1966 as a reservoir area (although he admitted that reservoir areas

are not officially recognized by either the planning or zoning officials of Baltimore County and that the idea of a reservoir of R. 40 land bounded as he suggested had first occurred to him when, in the words of the question to him by counsel for the protestants, "you were trying to justify your position in appearing in this case today for the petitioner?"). The reasons he gave for his opinion were that sewerage is not present and the subject property and the other land in the "reservoir" area cannot be built on without it, the area is sparsely settled and will remain so until sewerage is available and that it was not fair to the public and the County Council for the planners to show the land as R. 20 when it cannot be built on.

Rebuttal to this testimony was that 290 homes are within the "reservoir area," most built since 1956, there are 466 homes within a one-quarter mile circle around the subject property and that within 2 miles some 800 additional housing units are soon to be constructed.

The Board found error in the failure of the planning board and the Council to provide areas to the north and west of the airport (R. 40 areas on which a special exception could be granted) "to alleviate the problem which was created by * * * the Board of Education, in its choice of site for the Chapel Hill Elementary School," and because "lack of public sewer, water and a history of poor percolation tests should have been compelling reasons to place the subject [property] in an R. 40 classification." The finding of error by the Board was impermissible as a matter of law for reasons to be noted later, but it appears that the actual basis for the Board's action was its belief that the granting of the special exception would be logical and appropriate. The Board said:

> "It also should be noted that although the Board is of the opinion that there is manifest error present, these proceedings are truly not in the nature of a reclassification from R-20 to R-40, for the property owner has no intention to develop for residential use, but rather these proceedings are in the nature of an application for

a special exception for airport use. Probably it
is not necessary to state that the only reason the
R-40 reclassification is sought is that a special
exception for airport use may only be attained
in residential R-40 zoned land."

Judge Haile was even more casual in his approach to
the matter of error. After having found that the appli-
cant had met the burden of showing that the special ex-
ception use would not be detrimental to the health, safety
or general welfare of the locality, he held that the Board
erred in extending the special exception use to the entire
6.07 acres, saying: "There is no evidence in the transcript
legally sufficient to support such an extension," and held
that only the runway area, as proposed to be extended,
should be covered by the special exception.

Judge Haile then said: "The Board's decision on this
issue of mistake in the map was unnecessary" but "since
the reclassification should be granted on other grounds
* * * the order of the Board * * * cannot be reversed."
*Cassidy v. Baltimore County Board of Appeals,* 218 Md.
418, was cited by him as holding that a special excep-
tion could be granted without reference to whether or not
there was original error or subsequent change, and Judge
Haile further opined that:

"It has been said that the error and change rule
does not apply to floating zone petitions, because
floating zones are similar to special exceptions.
The converse is true, that is to say, a special ex-
ception, such as the one applied for in this case,
is similar to an application for a change from
a euclidean zone to a floating zone."

These concepts of the nature of a special exception and
of the basis for its grant, are not those of the statutes and
the cases. *Cassidy v. Baltimore County Board of Appeals*
did not hold that a special exception can be granted with-
out regard to the classification of the land involved.
There, a utility asked for a reclassification from R. 6 to
M-H, a zone that would allow operation of a generating

plant as a permitted use. The Board did not reclassify but granted a special exception. This Court held this action proper because in the existing R. 6 zone a generating plant could be built and operated as a special exception.

A special exception is a use which has been legislatively predetermined to be conditionally compatable with the uses permitted as of right in a particular zone, the condition being that a zoning body must, in each case, decide under specified statutory standards whether the presumptive compatibility in fact exists. In *Rockville Fuel and Feed Company, Inc. v. Board of Appeals of the City of Gaithersburg*, 257 Md. 183, 188, 262 A. 2d 499, 502, we said:

> "In *Montgomery County v. Merlands Club, Inc.*, 202 Md. 279, 287, we went to some pains to stress that the special exception is a valid zoning mechanism that delegates to an administrative board a limited authority to permit enumerated uses which the legislative body has determined can, *prima facie*, properly be allowed in a specified use district, absent any fact or circumstance in a particular case which would change this presumptive finding."

There cannot be a scintilla of doubt that in Baltimore County, as generally, there cannot be a grant of a special exception unless the zoning statutes provide that the conditional use sought is permissible in the zone in which the land involved is situate, and that the floating zone rule has nothing to do with the granting or denial of a special exception. See §§ 502 and 270 of the Zoning Regulations of Baltimore County. In *Westview Park Improvement & Civic Ass'n. v. Hayes*, 256 Md. 575, 582-83, 261 A. 2d 164, 168, the application was for reclassification of a lot from R. 6 to a business zone and then the grant of a special exception to extend a filling station, a use not permitted in R. 6 and permitted in the business district only by special exception. This Court reversed the grant of the reclassification and the special exception, finding

no evidence of mistake or change. Judge Singley for the Court said:

> "Under our view of the case, we need consider only one [of the protestants' grounds of attack on the orders appealed from] : Was there legally sufficient evidence to support the granting of a reclassification from an R. 6 zone to a B.L. zone? Since we have concluded that there was not, most of the other portions of the Board's * * * order [including the grant of the special exception] tumble like a house of cards.
>
> "A C.N.S. District may be imposed * * * only on land zoned B.L. * * * which, under our holding, the Hayes property is not. A special exception for an automotive filling station can be granted * * * only in a C.N.S. District, where the Hayes property cannot be, so long as it is zoned R. 6."

In *Board of County Comm'rs of Howard County v. Turf Valley Associates,* 247 Md. 556, 562, the effort was to have 140 acres rezoned from one and two-family use to garden-type apartments and a shopping center. The trial court bought the argument of the appellant that the floating zone concept controlled, and reversed the Board which had guided itself by the mistake and change rule in denying the application. Judge Oppenheimer for the Court said:

> "The analogy of special exception uses has been applied to zoning actions dealing with the placement of a floating zone. *Bujno v. Montgomery Co. Council,* 243 Md. 110, 220 A. 2d 126 (1966) ; *Chatham [Corp. v. Beltram,* 243 Md. 138] ; *Beall [v. Montgomery County Council,* 240 Md. 77], and authorities therein cited. But this analogy is not applicable to situations like the one before us, where the governing application is only to change one existing use, established under a comprehensive zoning plan, to another existing, established use, where the result would be a spot

rezoning and where no original mistake or subsequent change has been established. To apply the floating zone approach to such situations would be in effect, either to open the floodgates of uncontrolled administrative discretion or to authorize the courts to zone and to rezone.

"* * * The application of the 'analogous to a special exception' approach to the placement of a floating zone does not mean that the 'change' or 'mistake' rule is no longer applicable to petitions for spot rezoning. We find that the 'change' or 'mistake' rule applies to this case."

To show that under established law no error permitting rezoning was shown to the Board will not take long. There is a strong presumption of the correctness of both original zoning and comprehensive rezoning and to effect a piecemeal change the applicant bears the burden, sometimes called heavy, sometimes onerous, of adducing strong evidence of error consequential to the property involved or substantial changes in the character of the neighborhood. *Shadynook Improvement Ass'n v. Molloy,* 232 Md. 265; *Greenblatt v. Toney Schloss Properties Corp.,* 235 Md. 9; *Mack v. Crandell,* 244 Md. 193; *Board of County Comm'rs of Howard County v. Turf Valley Associates, supra; France v. Shapiro,* 248 Md. 335; *Brenbrook Constr. Co. v. Dahne,* 254 Md. 443. An opinion, even that of an expert, is not evidence strong or substantial enough to show error unless the reasons given by the expert as the basis of his opinion or other supporting facts relied on by him are themselves substantial and strong enough to do so. *Greenblatt v. Toney Schloss Properties Corp., supra; Miller v. Abrahams,* 239 Md. 263; *Dill v. Jobar Corp.,* 242 Md. 16; *Smith v. Board of County Comm'rs of Howard County,* 252 Md. 280; *Westview Park Improvement & Civic Ass'n v. Hayes, supra.*

The opinion of the president of Baltimore Aviation that not enough land to permit expansion of the airport was provided in the 1966 zoning is no more probative than that of the official of the applicant in *Westview* that

the depth of commercial land provided on the comprehensive map at Johnnycake Road and Ingleside Avenue was insufficient for present day commercial uses. In addition, the Council was not asked to rezone land adjacent to the airport, did not want the airport enlarged because of its effect on the neighborhood, and was justified in assuming—as was the fact — that its operation was safe since it was licensed by the Federal and State regulatory bodies.

In *Co. Comm'rs of Cecil Co. v. Phillips,* 255 Md. 229, it was held that error in original zoning was not shown by failure to afford an industry extensive room to expand.

The reasons which the expert who testified for Baltimore Aviation gave in support of his opinion that there had been original error were not strong and substantial, being somewhat similar to those rejected in *Greenblatt, supra,* and weaker than those offered in *Shadynook, supra.* The land admittedly should have been zoned residential and the deficiencies of sewerage and poor percolation would have prevented immediate development and use of the land whether it had been zoned R. 40 or R. 20. It might not have been error to have zoned the subject property R. 40 but clearly it was not error to have zoned it R. 20. Zoning lines must be drawn by the legislative body and the strong presumption that they were correctly drawn ordinarily is not overcome by an opinion that one or more lines should have been drawn slightly to the east, the west, the north, the south, as *Greenblatt* and other cases have stressed. Baltimore Aviation did not meet its heavy, onerous burden of overcoming the strong presumption of correct official action, and there was no basis for a finding of error by the Board.

> *Order of the circuit court for Baltimore County reversed and case remanded for passage of an order denying the reclassification and the special exception applied for, costs to be paid by appellee.*