CABIN JOHN LIMITED PARTNERSHIP *v.*
MONTGOMERY COUNTY COUNCIL ET AL.

[No. 71, September Term, 1970.]

*Decided November 18, 1970.*

The cause was argued before HAMMOND, C. J., and MC-WILLIAMS, FINAN, SMITH and DIGGES, JJ.

*Richard J. Sincoff* for appellant.

*John B. Walsh, Jr., Assistant County Attorney,* with whom were *David L. Cahoon, County Attorney, Alfred H. Carter, Deputy County Attorney,* and *Stanley D. Abrams, Assistant County Attorney,* on the brief, for appellees.

SMITH, J., delivered the opinion of the Court.

We shall here affirm the action of a trial judge (Moore, J.) who affirmed a denial by a District Council of a request for rezoning.

Appellant Cabin John Limited Partnership (Cabin John) is the owner of a parcel of land said to comprise three-quarters of an acre located at the northwest corner of the intersection of Tuckerman Lane and Seven Locks Road in Montgomery County in the Cabin John Planning Area. The master plan for Cabin John Watershed was adopted in 1957. By a sectional map amendment in 1958 subject property was placed in a R-90 zone (One-Family, Detached, Strictly Residential, 9,000 square foot minimum lot size). It was continued in that classification when an amended zoning ordinance and map was adopted on May 31, 1958, which is the most recent comprehensive rezoning applicable to the property. What was here sought was a change to a C-1 zone (Local Commercial).

Cabin John presents three basic questions to us. The first two deal with whether Cabin John established an error in the original zoning or a change of conditions. The other one has to do with the hearing examiner's refusal to admit testimony relative to a market survey.

The land in question is improved by a two-story frame dwelling. It is a lot with a frontage of 215.36 feet on Tuckerman Lane, a depth back from Tuckerman Lane of 180.06 feet, a frontage on Seven Locks Road of 155.73 feet and a depth running back from Seven Locks Road of 194 feet. Dubbed as "totally irrelevant" by Cabin John is the fact that it also owns the land adjoining on the west as well as two other corners of the intersection.

To the west of the immediately adjoining land owned

by Cabin John there is an extensive area zoned R-90 known as Regency Estates with a number of homes in the $35,000.00 to $45,000.00 price range. The land owned by applicant between subject property and Regency Estates is said to comprise approximately 8.2 acres. It has been zoned R-90 since 1958.

The land on Seven Locks Road north of subject land and the adjoining parcel owned by Cabin John, said to be "of relatively level topography", is undeveloped and has been zoned R-90 since 1958. It in turn is abutted by a 10 acre parcel owned by Cabin John and zoned R-90 since 1958, upon which approximately 31 single-family homes are being developed.

In the northeast quadrant there is a tract of five acres zoned C-1 since 1958. At the time of the hearing three and a half acres of that were under development by Cabin John as a modern shopping facility. Although in the northeast quadrant, this land did not abut on the intersection, but was set back approximately 300 feet. The remaining one and a half acres were not being developed at the time of the hearing. One-half of it is owned by Cabin John; the other half (or three-quarters of an acre) is owned by a third party. Surrounding all but the northwesternmost portion of this commercial land is a tract of approximately 12 acres zoned R-90 since 1958 upon which an off-street parking lot to be utilized in connection with the adjoining commercial use was in the process of development at the time of hearing. This tract also is owned by Cabin John, whose land in the northeast quadrant totals approximately 80 acres.

Cabin John owns approximately 170 acres of land in the southwest quadrant of the intersection, most of which has been zoned R-90 since 1958 and is undeveloped. In the southeast of the intersection all of the land has been zoned R-90 since 1958.

Certain of the witnesses produced by Cabin John were concerned with the possibility of erection of a service station on the property since it was stated that if the rezoning were granted an application would be made for a

special exception to permit a service station. Their testimony is not relevant to the issue of whether the rezoning should have been granted since their testimony was not concerned with whether there had been an error in the original zoning nor did it bear upon the issue of change.

On the issue of change or mistake there were two witnesses, Page F. Hopkins and Robert B. Friedman, the latter of whom was also an officer in a company which was a partner in Cabin John.

Hopkins pointed out that the topography of the lot is extremely precipitous, having "a difference in elevation in excess of 40 feet".[1] He said in part:

"In reviewing both the topography and the land use as set forth in the Cabin John master plan, it is our considered opinion that a mistake occurred in leaving that land in the northwest quadrant in the single family residential category because of two factors.

"One, it has the worst topography of the four corners of the intersection. Secondly and just as important, the ownership is fragmented. And it has been proven time and time again that it is virtually impossible to combine fragmented ownerships. The specific piece of ground that we are working with because of its small size and because of the 40 feet of topographic relief on the subject property makes it completely unusable in its existing zoning category."

He admitted that it might be possible to build two homes

---

1. From the contour map filed as an exhibit it would appear that the difference down the west property line would be in excess of 40 feet. It also indicates that in the center of the Tuckerman Lane frontage the difference would be less than 30 feet. Moreover, in the center to a point about 90 feet back from the road the difference is less than 10 feet. The slope or rise runs roughly east and west with Tuckerman Lane being to the south. The difference from south to north in the first 50 feet down Seven Locks Road appears to be about two feet with another rise of about eight feet in the remaining Seven Locks Road frontage. Certainly, the total variation down that road is no more than twelve feet, south to north.

on the land but said that two possible homes on 38,000 square feet of R-90 land was not reasonable yield for the land and that the continuation of R-90 was in effect a confiscation of the land.

On the issue of change, Hopkins said there had been a substantial increase in the number of dwelling units in the neighborhood, although the neighborhood did not appear to be defined with precision. He estimated that there had been an increase of 2,017 dwelling units in the area, which he thought "would produce 7,080 additional people over and above what the plan originally contemplated". He also pointed out that 96.2 acres of I-3 (Industrial Park) and .2 of an acre of C-0 (Commercial Office Building) zoning, both within the Cabin John Plan, would "produce 100 people per acre from the standpoint of buying power", providing "a total increase in buying power within the area not contemplated when the plan was developed of 16,700 people". He estimated "that there are going to be approximately 9,000 plus people employed in the area." He said that since 1958 a total of 10.7 acres in the Cabin John Master Plan area had been "rezoned to either the C-1 or the C-2", although he qualified that by pointing out "that the bulk of that was in the Village of Potomac which is now covered by the Potomac-Travilah Plan. But there were a total of seven separate applications granted since 1960". As Cabin John puts it in its brief:

> "These increases of residential units and their consequent increase in population were used by Hopkins to demonstrate a change in conditions which would warrant additional local commercial zoning. He did not use all the other zoning changes in the Plan for justification. He noted that the planning commission's guideline for this type of commercial is one acre per 1,000 population, and that, thus, additional commercial clearly was called for.
>
> "Hopkins also pointed out that the commer-

cial zoning planned for this location in 1957 had not been increased despite zoning changes and increases in residential units."

Hopkins claimed it was impossible to obtain the "highest and best use" of subject property if it were retained in the present R-90 classification.

Friedman was actually called as a witness by the opposition. He said that there had been a proposal for a fire station on subject property which would have been a use permitted in a R-90 zone. This plan did not materialize. Various studies were then made to determine an appropriate use for the property. He thought it unsuitable for development in the R-90 classification because of its shape, size and location, and believed that only two R-90 lots could be achieved. He said development costs would be about $11,000.00 a lot, that a finished lot (including cost of land) would cost about $23,-000.00, and that, in his opinion, a house selling for "four to five times that" or $100,000.00 would have to be built, "which is way out of range of that neighborhood" of $35,-000.00 to $45,000.00 houses.

Extensive evidence was presented to the hearing examiner who recommended rejection of the application. Her excellent and very comprehensive opinion included the following:

"The only reclassifications which have occurred in this general area since 1958, the date of the last comprehensive rezoning applicable to the subject property, lie approximately ¾ of a mile, or more, away from the subject property. Approximately ¾ of a mile to the west of the subject property, and lying south of the Regency Estates Subdivision, in excess of 160 acres of land have been reclassified from the R-R zone (Rural Residential, 20,000 square foot minimum lot size) to the R-150 zone (Density Control Development, One-Family, Detached, Restricted, Residential, 15,000 square foot mini-

mum average net lot area) by the grant of Application Nos. E-110 in 1965; E-709 in 1966; and E-979 and E-980 in 1967. A substantial R-150 subdivision, known as Fox Hills, containing several hundred homes has been developing on much of this property. Approximately ¾ of a mile to a mile to the south of the subject property, and lying along the east side of Seven Locks Road, approximately 25 acres of land have been reclassified from the R-90 zone to the R-T zone (Town houses, 3,500 square foot minimum net lot area per town house) by the grant of Application Nos. E-276 in 1965; E-605 in 1966; and E-1016 in 1967. No construction has yet taken place on any of this R-T zoned land. Other reclassifications from less dense to more dense residential zones have occurred in areas more than a mile distant from the subject property. Indeed, since 1958, there have been in excess of 30 zoning reclassifications in the entire Cabin John Planning Area.

"There are presently a number of shopping facilities available to service the area herein involved. All of the property within a one mile radius of the subject property falls within the trading area which the 3.5 acre neighborhood shopping center, recently completed in the northeast quadrant of the intersection herein involved, is designed to service. This same area also falls within the 4-mile trading area radius which the recently completed, 60 acre regional shopping center, known as Montgomery Mall, located at the intersection of Bells Mill Road and I-70S, approximately 2 miles to the southeast of the subject property, is designed to serve. The Wildwood Shopping Center, located at the intersection of Bells Mill Road and Old Georgetown Road, and the 15-acre Potomac Shopping Center, located at the intersection of River Road and

Falls Road, each lie approximately 3 miles to the southeast and southwest respectively, of the subject property. There are extensive shopping facilities, including Congressional Plaza, a Super Giant, and Korvette's located to the north of the subject property on the Rockville Pike. In addition, Application No. E-914, a request for the reclassification from the R-R zone to the C-1 zone of a 15 acre tract of land, lying on the west side of Falls Road, south of the proposed Outer Circumferential Freeway, approximately 3/4 miles to the northwest of the subject property, is presently pending before the Hearing Examiner.

"In addition to these commercial facilities, there are in excess of 20 automobile filling stations with a total of in excess of 160 pumps located within a 3 mile radius of the subject property. The closest of these stations are two located at Montgomery Mall, approximately 2 miles from the subject property."

At another point she said:

"There have been a number of reclassifications of land lying 3/4 of a mile or more from the subject property. All of these reclassifications have been from the R-R zone to the R-150 zone or from the R-90 zone to the R-T zone. The Fox Hills Subdivision, a subdivision of substantial, high quality homes, has been developing on a portion of the land reclassified to the R-150 zone. No development has yet taken place on any of the land reclassified to the R-T zone.

"The applicant contends that these changes are sufficient to justify the requested reclassification in the instant case. I do not agree. All of the reclassifications relied upon are too remote from the subject property to have any significant impact on the neighborhood as a whole

or the subject property in particular. Moreover, because the reclassifications from the R-R zone to the R-150 zone resulted in development less dense than that resulting from the R-90 zoning of the subject property and its environs, such reclassifications and development are too minimal in effect to constitute evidence of a substantial change in the character of the neighborhood. The reclassifications from the R-90 zone to the R-T zone are equally ineffective as evidence of substantial change in the character of the neighborhood, primarily because these reclassifications are to a 'floating zone' validly determined by the Council to be compatible with the surrounding neighborhood, and in part, because no development has yet taken place on this R-T zoned ground.

"The crux of the matter is that the area within a radius of ¾ of a mile of the subject property is developing in accordance with the Master Plan; that beyond this area changes have taken place which have or will result in less dense, single-family, detached, residential development than that occurring within the ¾ mile radius or in more dense single-family, attached, residential development, which is, nonetheless, compatible with the surrounding area; and that consequently, nothing has taken place either within the ¾ mile radius or beyond it which justifies reclassification in the instant case. On the basis of the evidence presented, I find and conclude that there has not been a change in the character of the neighborhood sufficient to justify the requested reclassification."

There is a strong presumption of the correctness of original zoning and of comprehensive rezoning. To sustain a piecemeal change therefrom there must be produced strong evidence of mistake in the original zoning

or comprehensive rezoning or else evidence of substantial change in the character of the neighborhood. *Surkovich v. Doub*, 258 Md. 263, 270, 265 A. 2d 447 (1970); *Wells v. Pierpont*, 253 Md. 554, 557, 253 A. 2d 749 (1969), and cases there cited. The burden of proof facing one seeking a rezoning classification is quite onerous. *Wells v. Pierpont, supra*, and *Agneslane, Inc. v. Lucas*, 247 Md. 612, 618, 233 A. 2d 757 (1967). A mere increase in population does not prove a change in the character of the neighborhood sufficient to justify another type of zoning. *County Comm'rs v. Fairwinds*, 230 Md. 569, 572, 187 A. 2d 845 (1963); *Didlake v. Poteet*, 228 Md. 588, 591, 180 A. 2d 828 (1963). As Judge Singley said for the Court in *Germenko v. County Bd. of Appeals*, 257 Md. 706, 711, 264 A. 2d 825 (1970):

> "We have repeatedly stated that it is not the function of the courts to zone or rezone, and that courts will not substitute their judgment for the expertise of zoning officials. Only when there is no room for reasonable debate or where the record is devoid of substantial supporting facts are the courts justified in reversing a decision of an administrative body or in declaring its action arbitrary, capricious or illegal. *Minor v. Shifflett*, 252 Md. 158, 249 A. 2d 159 (1969); *France v. Shapiro*, 248 Md. 335, 236 A. 2d 726 (1968); *The Jobar Corp. v. Rodgers Forge Community Ass'n*, 236 Md. 106, 120, 202 A. 2d 612 (1964)." *Id.* at 711.

To establish that a zoning classification amounts to confiscation it is incumbent upon the property owner to prove that the existing zoning deprives him of *all* reasonable use of his property and it is incumbent upon him to show that the property could not be used for *any* of the permitted uses in the existing zone. *Zoning Bd. of Howard Co. v. Kanode*, 258 Md. 586, 596, 267 A. 2d 138 (1970); *Montgomery Co. Council v. Kacur*, 253 Md. 220, 229, 252 A. 2d 832 (1969), and cases cited in each.

Neither the fact that rezoning may result in a more profitable use of land nor that hardship may follow the retention of an existing classification is sufficient justification for rezoning. *Germenko* and cases there cited.

Our examination of the facts here alleged is done in the light of the holdings above cited.

### I.

Mr. Hopkins, Cabin John's expert, acknowledged that other homes in the area are built on steep grades and conceded that it would be possible to build two single family homes on this tract, although they "would be most undesirable lots". It was conceded that the lot is improved by a currently occupied two-story frame dwelling. The hearing examiner noted in her report most of the permitted uses [2] and special exception uses [3] set forth in the applicable section of the Montgomery County Code at the time of hearing.

None of the witnesses presented by Cabin John said that *no* use could be made of the property under the present classification. No witness could have taken that position since the property is currently occupied for residential purposes. Rather, Hopkins appears to have based his conclusion that Cabin John was deprived of all reasonable use of the property upon his belief that it was more commercially feasible to use it for other than residential purposes. If that were to be the criteria of confiscation,

---

2. Montgomery County Code (1965), § 111-9 (a) establishes a fire station as a permitted use in the R-90 zone. Other permitted uses in this zone include: churches, convents, monasteries and other places of worship; dwellings, one-family detached; ambulance and rescue squads; libraries, museums and similar institutions of a noncommercial nature; professional office in a one-family dwelling; and publicly owned or government operated buildings including community buildings.

3. Montgomery County Code (1965), § 111-9 (b) establishes in excess of 20 special exception uses in the R-90 zone including, among others, the following: child care homes, private education institutions, eleemosynary and philanthropic institutions, home occupations, hospitals, nursing and care homes, medical and dental clinics, medical practitioner's office, noncommercial research institutions, public utility buildings, scientific society headquarters, community swimming pool, tea houses or restaurants, and two-family dwellings.

zoning restrictions in many areas would collapse like a house of cards.

At the very least, the issue of original mistake was fairly debatable and we shall not substitute our judgment for that of the zoning authorities.

## II.

Cabin John says, "This Court has held that an increase in housing units and consequent growth in population can reasonably lead to the need for additional zoning in the area to supply the needs of the increased population." It also says, "The Court has upheld commercial rezoning for the purpose of creating a small retail area in a residential community, when there was substantial evidence that the proposed use was for the convenience and accommodation of the residents."

The short answer to these contentions is found in *Hardesty v. Dunphy*, 259 Md. 718, 271 A. 2d 152 (1970), and *Chapman v. Montgomery County Council*, 259 Md. 641, 271 A. 2d 156 (1970), both decided today.

In *Chapman* Judge Finan said for the Court:

> "This Court has repeatedly stated that an increase in population per se does not prove a substantial change in the character of the neighborhood." (citing authorities) *Id.* at 649.

The alleged change in the neighborhood there rested upon intensification of residential uses. This Court reversed the action of the circuit court which had affirmed the granting of a zoning reclassification based upon this change.

In *Hardesty*, there was an attempt to obtain a local shopping center in a rural residential area. Judge Digges there said for the Court:

> "Even if we accept the Board's implicit conclusion that the distance to the presently existing shopping centers is unreasonable, in the passage quoted from *Miller v. Abrahams*, [257 Md. 126, 262 A. 2d 524 (1970)], it is abundantly

clear that *Cassell* [*v. City of Baltimore,* 195 Md. 348, 355, 356, 73 A. 2d 486 (1950)], the seminal case in this area, does not represent the proposition that need can serve as a substitute for change or mistake. In all individual applications for reclassification, there must first be a finding of substantial change in the character of the neighborhood or mistake in the comprehensive plan. Yet this finding alone 'merely *permits* the legislative body to grant the requested rezoning but does not *require* it to do so.' *Messenger v. Board of County Commissioners,* [259 Md. 693, 271 A. 2d 172 (1970)]. It is then that the factor of need can play a significant role, for if there is no need whatsoever the rezoning might be arbitrary and capricious, see *Wakefield v. Kraft,* 202 Md. 136, 157, 96 A. 2d 27 (1953) (Sobeloff, C.J., dissenting) or, as is normally the case, the factor of need would be a 'debatable question' to be weighed with other elements in determining the desirability of the rezoning. If there has not been a legally sufficient change or mistake, regional comprehensive rezoning is the only method available to provide for the needs of a nascent residential community." (Emphasis in original.) *Id.* at 725.

See also *Harley v. Aluisi,* 259 Md. 275, 269 A. 2d 575 (1970).

As has been said by this Court many times in this type of case, the question with which we are here concerned is not whether we might have reached a different conclusion upon the evidence presented, but rather whether from the evidence reasonable men might have reached the conclusion here reached by the Council. We conclude that the Council was not arbitrary and capricious in its decision that change in the character of the neighborhood was not clearly established. At the very least, the issue of change was fairly debatable.

## III.

Mr. David Snyder, associated with a marketing and marketing research organization, was called as a witness by Cabin John. He claimed to have made "a market analysis of the residential community in the area of approximately one mile around the subject corner". As he put it:

"We used standard telephone interviewing techniques as we have used in several hundred thousand additional interviews. We developed a questionnaire designed to elicit the *residents' attitudes* concerning the usefulness of a service station in a neighborhood like theirs. Whether they *favored, opposed,* or were *neutral* towards a service station at this specific site, the northwest corner of Tuckerman Lane and Seven Locks Road across from the shopping center." (Emphasis added.)

He said there were approximately 950 homes in the area and that his organization "contacted 99.9% [4] of the households". Upon Mr. Snyder's refusal to give the protestants the names of the persons interviewed, the hearing examiner, Mrs. Davidson, sustained an objection to the admission of the survey, stating, "It is my determination in the absence of the production of the names of the people who were canvassed, I will not admit this market survey into evidence."

We think she was right for the wrong reason. Examination of the evidence here leads to the inevitable conclusion that what was called a "market analysis", "study" and "survey" at various times was nothing more than a poll of the neighborhood for the purpose of ascertaining whether its residents were for or against a service station. This is reminiscent of *Benner v. Tribbitt,* 190 Md. 6, 57 A. 2d 346 (1948), where, on the issue of whether a town had arbitrarily refused to grant a building permit

---

4. It makes no difference on the issue here but this must have been a slip of the tongue, as the report shows (and the figures actually work out to) 91.9% rather than 99.9%.

for a filling station, Judge (later Chief Judge) Markell said for the Court:

> "But in restricting individual rights by exercise of the police power neither a municipal corporation nor the state legislature itself can deprive an individual of property rights by a plebiscite of neighbors or for their benefit." *Id.* at 20.

This point has been carried over into zoning cases. *Smith v. Co. Comm'rs of Howard Co.,* 252 Md. 280, 285, 249 A. 2d 708 (1969); *Mayor and Council v. Cotler,* 230 Md. 335, 340, 187 A. 2d 94 (1963); and *Mont. Co. Council v. Scrimgeour,* 211 Md. 306, 313, 127 A. 2d 528 (1956). In *Cotler* Chief Judge Brune put the matter rather bluntly saying, "[A] decision * * * based upon a plebiscite of neighbors, * * * is not permissible." By whatever name it may have been called, it appears that the "market survey" here was a plebiscite of the neighbors.

*Order affirmed; appellant to pay the costs.*