HELLER ET AL. *v.* PRINCE GEORGE'S COUNTY ET AL.

[No. 199, September Term, 1971.]

*Decided February 9, 1972.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*James F. Vance* for appellants.

*Barry S. Cramp, Associate County Attorney,* with whom was *Walter H. Maloney, Jr., County Attorney,* on the brief, for Prince George's County, part of appellees. *R. Ronald Sinclair,* with whom were *Sinclair & Chapdelaine* on the brief, for Ray M. Dowe and Alice Dowe, other appellees.

MCWILLIAMS, J., delivered the opinion of the Court.

The Dowes own a seven acre parcel in Prince George's County on the east side of Maryland Route 3 (Crain Highway) about a mile south of Priest Bridge where Route 3 crosses the Patuxent River. Early in 1970, having contracted to sell it, subject to rezoning, to Robert C. Reid, the editor and publisher of the Bowie Blade, they sought to have the property reclassified from R-R (Rural Residential) to I-1 (Light Industrial). The Prince George's County Planning Board, adopting the recommendation of its Technical Staff, recommended to the County Commissioners sitting as the District Council [1]

1. Since 8 February 1971, the effective date of the Charter, the

that 3.19 acres be placed in the I-1 classification (subject to certain conditions no longer relevant), and that 3.80 acres be "withheld from consideration in order to provide for parks." [2] On 30 October 1970 the Council adopted a resolution reclassifying the property in accordance with the recommendation of the Planning Board. In June the Circuit Court for Prince George's County (Meloy, J.) affirmed the action of the Council. The appeal to this Court followed.

We have said quite often that there is a strong presumption of the correctness of original zoning and comprehensive rezoning and that to sustain a piecemeal change therefrom there must be produced strong evidence of mistake in the original zoning or else evidence of a change in conditions resulting in a substantial change in the character of the neighborhood. *Wells v. Pierpont,* 253 Md. 554, 557 (1969). The burden of proof, of course, is quite onerous and it rests squarely on the one seeking the reclassification. *Agneslane, Inc. v. Lucas,* 247 Md. 612, 618 (1967).

Conspicuously relevant here is what Judge Barnes said, for the Court, in *Montgomery v. Board of County Comm'rs for Prince George's County,* 256 Md. 597, 602 (1970):

> "Inasmuch as there is no contention in the present case that there was a mistake in the original zoning [the same is true here], it was necessary that the applicants establish before the District Council (a) what area reasonably constituted the 'neighborhood' of the subject property, (b) the changes which have occurred in that neighborhood since the comprehensive rezoning and (c) that these changes resulted in a change in the character of the neighborhood.

corporate name of the county has been and is now "Prince George's County, Maryland." Section 714 of the Charter makes the County Council the District Council.

2. The eastern boundary of the property abuts the Patuxent River Watershed Park.

These are the 'basic facts' and 'conclusions' which the District Council must find and express in writing when it grants or denies a map amendment or special exception."

It is in this light that the "Findings of Fact and Conclusions" of the District Council must be tested and to that end they are repeated below in full:

"FINDINGS OF FACT AND CONCLUSIONS

"The subject property is located on the east side of Route 3, which is also shown as Route 301 on the Zoning Map, and is 1,400 feet north of Cambridge Court. It is located in the northeast quadrant of the intersection of Route 50 and Route 301-3. The Patuxent River forms a natural barrier to the east. To the west is Bowie, with its eastern boundary terminating on the west side of Route 3.

"Although the property is not located within the city limits, it is related physically and socially with the vicinity west of Route 3. The City of Bowie considered this application and opposition did come from the Bowie vicinity. We find that the neighborhood is not so clear of delineation as to exclude the City of Bowie. This is particularly true where the area is rural in character and where, as here, a plan includes the subject property within a larger one.

"We are mindful of the Bowie-Collington Master Plan and note that the Planning Commission and its staff, as well as the City, recommend the zoning. We think it important because we are within the initial stages of development of this Plan to adhere to it substantially. We find that the granting of this application with conditions, so as to protect neighboring properties meets the suggestions of the plan and the development of the proposed use would be compatible with the neighboring uses. The City

helped develop the plan and criteria for use in this area and obviously thought this application met the locational criteria newly adopted by the Plan.

"We feel that the zoning changes shown on the map, the increase in density in Bowie and immediately south of the subject property, the increase of traffic on Route 3, the establishment of a fraternal organization and religious use south of the subject property, are substantial changes which have established the future development pattern. The properties along Route 3 in this area have lost their potential for residential development and can be properly called an employment area.

"We do not think the granting of this request will establish strip zoning on Route 3. The fact that this property is abutting an industrial like use, has a service road, and will not be developed under the ordinary concept of industrial use, abuts park property to the east and will be buffered from Route 3 and is adjoined by non-residential uses to the south, negates the possibility of this kind of future zoning."

Notwithstanding appellees' failure to produce any evidence tending to establish what area reasonably constitutes the "neighborhood" the Council had a go at it anyway. The result, the second paragraph of the "Findings of Fact and Conclusions," might well have been written by Charles Dillon Stengel. *Ellis v. Bailey*, 249 Md. 591, 592 (1968). How illuminating it is to be told that the "neighborhood is not so clear of delineation as to exclude the City of Bowie," and to learn that this is "particularly true where *the area is rural in character* and where, as here, a plan includes the subject property within a larger one." (Emphasis added.) Just how a neighborhood can be "rural in character" and, at the same time include, or not exclude, the City of Bowie is beyond our ken, yet that

is what the Council seems to be trying to say. But, as we shall see, it makes little or no difference here. We shall assume that the plan mentioned by the Council is the Bowie-Collington Master Plan, adopted in July 1970. The Council begins the third paragraph of its findings with a pious acknowledgment of the existence of the plan and then, with prestidigitatory grandeur, proceeds to sweep it aside. The same paragraph implies, in a murky sort of way, that the reclassification "meets the suggestions of the plan." The Council sees support for this implication in the speculation that the City of Bowie "obviously thought this application met the locational criteria newly adopted by the plan." The expression "locational criteria" seems to have reference to certain "conditional employment areas" shown on the map accompanying the plan. The hard cold fact, however, is that the nearest "conditional employment area" shown on the map is a good half mile south of the Dowe property. The area is in the northeast quadrant of the interchange of the John Hanson Highway (U. S. Route 50) and U. S. Route 301-Maryland Route 3, and a few hundred feet north of it.[3] As we see it the proposed reclassification is clearly at odds with the plan.

Other than an espousal of the recommendations of the Planning Board the appellees offered no evidence of any change in conditions which might have produced a substantial change in the character of the neighborhood, whatever its area might reasonably be said to be. The Council cited "zoning changes shown on the map," increases "in density in Bowie" and south of the property, the establishment of a fraternal organization and a religious use south of the property as being "substantial changes which have established the future development pattern." One cannot but be struck by the studious avoidance of the phrase "substantial change in the character of the neighborhood." But if we look closely we see that

---

3. U.S. Route 301 turns east at the interchange; Maryland Route 3 continues its northerly direction.

there is no substance in the cited changes. There is nothing in the record about "zoning changes shown on the map." We assume that by "map" is meant Exhibit 1A, identified as a segment of the Zoning Map adopted in 1959. The Dowes' property looks to be an island surrounded by a sea of land zoned R-R. The nearest zoning change is more than a mile away as the crow flies; by road it appears to be about two and a half miles. It is true, of course, that there has been an increase in the population of Bowie, Sherwood Manor (just south of the property) and Forest Hills (on the other side of Route 3) but as Chief Judge Hammond said in *Heller v. Segner,* 260 Md. 393, 399 (1971),

> "* * * [I]n some six cases at least in the last two years, we have held that intensification, even heavy intensification resulting in large population growth, of residential uses adjacent to or surrounding a residential property sought to be rezoned to commercial use * * * will not of itself justify or support the commercial rezoning * * *"

citing *Wright v. McCubbin,* 260 Md. 11 (1970) ; *Hardesty v. Dunphy,* 259 Md. 718 (1970) ; *Cabin John Ltd. v. Montgomery County,* 259 Md. 661 (1970) ; *Chapman v. Montgomery County,* 259 Md. 641 (1970) ; *Harley v. Aluisi,* 259 Md. 275 (1970) ; *Miller v. Abrahams,* 257 Md. 126 (1970) ; *Wells v. Pierpont,* 253 Md. 554 (1969).

An "increase of traffic on Route 3" was mentioned but how much it may have increased was not shown. It is common knowledge, we think, that for many years Route 3 has been a heavily traveled highway. Whether its use when the zoning map was adopted in 1959 was greater or less than it is now has not been shown nor do we think it significant. *Surkovich v. Doub,* 258 Md. 263, 272 (1970) ; *Elliott v. Joyce,* 233 Md. 76, 81 (1963).

The "religious use south of the subject property" has to do with the adjoining 4.6 acre parcel owned by the Trustees of the Belcroft Bible Church and on which they

propose to build a church that will seat 250 people. Churches are permitted uses in the R-R zone and we have said that the location in a residential zone of improvements of a character permitted by the ordinance, even though not necessarily compatible with a residential development, is not the type of change in character of a neighborhood which will justify reclassification. *France v. Shapiro*, 248 Md. 335, 343 (1968), and the cases therein cited.

The mention of "the establishment of a fraternal organization" obviously refers to the 3.50 acre parcel adjoining the church property upon which the Knights of Columbus, at the time of the hearing before the Council, were building their clubhouse. It appears to be conceded that a special exception for this purpose was obtained. It is indeed odd, therefore, to find the Council citing as evidence of a substantial change in the character of the neighborhood a use which it must already have determined to be compatible with the R-R classification. *Creswell v. Baltimore Aviation Service, Inc.*, 257 Md. 712, 719 (1970).

The Technical Staff mentioned two nonconforming uses, a junkyard 500 feet north of the Dowe property and a sawmill one-half mile further north. It was careful to call them "variations from residential land uses." The notion that legal nonconforming uses are not evidence of a change in the character of the neighborhood can hardly be questioned at this late date and that, we assume, is the reason the Council avoided any reference to them. *Helfrich v. Mongelli*, 248 Md. 498, 505 (1968). Nevertheless the appellees argue, and Judge Meloy seems to have agreed, that the recommendations of the Technical Staff and the Planning Board constitute probative evidence which alone is enough to make the issue of change fairly debatable, citing *Finney v. Halle*, 241 Md. 224 (1966). We think the uncontradicted testimony of Kathleen Montgomery, *infra*, in light of what we said in *Habliston v. City of Salisbury*, 258 Md. 350, 361-62 (1970), is dispositive of this argument. Mrs. Montgomery

pointed out "18 substantial errors" in the report of the Technical Staff. She doubted the author of it "really left his office" but she did not "believe that this shoddy workmanship is typical" of the Planning Board. She preferred "to think that the author was either ill, overworked or had not had time to study the master plan or to visit the subject area in person." She noted, with obvious relish, that "the author of this particular technical report is no longer with" the Planning Board. Our review of the record persuades us she was not far off the mark. In *Habliston* we said:

> "Appellees attach significance to the Planning Commission's adoption of the staff report recommending the reclassification from 'Industrial' to 'Residential B' and the Commission's like recommendation to the City Council. They say we have held that 'these reports are "probative evidence" ' which, per se, can make the change issue fairly debatable, citing * * * [cases]. In a sense this is true but it must not be supposed that such reports, per se, are either inviolate or invulnerable. They are subject to the same analysis and appraisal that other types of evidence must survive to have probative force. The statements of both Creamer and Burhans, his assistant, make it quite clear that there was little, if any, investigation and study of the situation by the staff and that its conclusions do not rise much, if at all, above the level of wishful thinking; in *Board of County Comm'rs v. Oak Hill Farms*, 232 Md. 274, 284 (1963), we said the 'staff report dealt largely in abstractions without meaningful specifics.' Other than the bland and entirely unsupported assumption of 'a change in the character of the area from industrial to predominantly residential use due to abandonment of the brickyard' there is nothing whatever in the staff report touching up-

on events or circumstances which might affect the character of the neighborhood. We find absurd the notion that this kind of 'tinkling cymbal' should make an issue fairly debatable merely because it was written by the Planning Commission's staff and then made a part of the record before the Council."

There was a broad suggestion at argument that the establishment may have been bending over backward a little in order to win a few Brownie points with the publisher of the Blade. If true then, as we see it, the Council bent over a little too far. The learned trial judge should have reversed the action of the Council.

*Order reversed.*
*Costs to be paid by the appellees.*