## TRAINER ET AL. *v.* LIPCHIN ET AL.

[No. 16, September Term, 1973.]

*Decided October 2, 1973.*

The cause was argued before BARNES, MCWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Anne Kay Kramer* for appellants.

*W. Lee Harrison,* with whom were *Cooper C. Graham* and *Theodore R. McKeldin* on the brief, for appellees.

LEVINE, J., delivered the opinion of the Court.

This case presents yet another assault on the county-wide comprehensive zoning maps adopted by the Baltimore County Council (the Council) on March 24, 1971.[1] Almost immediately thereafter, appellees filed an application to rezone the 4.16 acres of subject property from the Council's designated classifications to the B.L. (business local) zone. The front portion, containing 1.76 acres, had been zoned by the Council as D.R. 16 (density residential, 16 units per acre) to a depth of 150 feet, and the remainder had been zoned D.R. 3.5 (3.5 residential units per acre).

The Deputy Zoning Commissioner initially heard the rezoning application and denied it. On appeal, the County Board of Appeals (the Board) reversed, in part, the Deputy Zoning Commissioner by granting the requested zoning for the front portion, but affirmed so much of the decision that retained the remainder of the property in D.R. 3.5. Appellants, who appeared as protestants before the Board, appealed the decision to the Circuit Court for Baltimore County. There, Judge John N. Maguire affirmed the Board's decision. From that ruling, this appeal has been taken.

The subject property is improved by a dwelling and garage. It is located on the south side of Ridgely Avenue which terminates at that point because the Northern Central Railroad tracks are adjacent to the western boundary of the property. A Baltimore Gas & Electric Company substation is located on the same side of Ridgely Avenue on a quarter-acre parcel which appears to have been carved out of the subject property. The north side of Ridgely Avenue is dominated by retail commercial development that includes a shopping center and additional stores. Ridgely Avenue intersects with York Road approximately 1,000 feet east of the subject property. The south side of the street in this block is characterized by residential development.

Situated immediately to the rear of the subject property is

---

1. Similar attacks were made in Stratakis v. Beauchamp, 268 Md. 643, 304 A. 2d 244 (1973); Ford v. Baltimore County, 268 Md. 172, 300 A. 2d 204 (1973); and Nottingham Village v. Balto. Co., 266 Md. 339, 292 A. 2d 680 (1972).

the community of Lutherville, which was founded in 1852. Many of its existing homes, including a number occupied by protestants appearing in this case, were built in the 1850's. In 1972, a segment of the community was listed as a historic district by the Maryland Historical Trust, which has also nominated it to the National Register of Historic Sites and Places.

Prior to the adoption of the comprehensive map on March 24, 1971, the subject property had been zoned in the R-10 classification (single family residential, 10,000 square-foot minimum lot size). Appellees' application was reviewed by the Baltimore County Zoning Advisory Committee which submitted a detailed report on May 18, 1971. By way of analyzing the impact that the proposed reclassification might have on highways and other public facilities, the report states in relevant part:

> ". . . [T]he intersection of Ridgely Road and York Road is presently at capacity and serious delays occur during certain periods of the day. Any increase in trip density from the subject property can only aggravate the existing problem.

* * *

> ". . . Any additional commercial development in this area will only compound the existing problem which exists at the intersection of Ridgely Road and York Road as far as traffic is concerned. Serious delays can be anticipated at peak hours as far as traffic congestion is concerned."

A hearing on the application was held before the Deputy Zoning Commissioner. He concluded, largely because of the expected impact on traffic, that the rezoning "would be detrimental to the health, safety and general welfare of the community," and therefore denied the request. In virtually every proceeding, the application was discussed in light of proposed extensions of Charles Street and Greenspring Drive, and the resulting realignment of Ridgely Avenue. The principal consequence of this proposed development would

be the construction of two elevated highways, one of which would cut a swath through the rear of the subject property, thereby severing a small portion and creating what is characterized as a "Chinese Wall" around the main part.

As will be noted later, a major thrust of appellees' case before the various agencies was that this project would separate the subject property from the residential area to the south, thereby linking it with the commercial development on the north side of the street. In rejecting this contention, the Deputy Zoning Commissioner noted that these improvements would not materialize for five to twenty years, and thus the "traffic problems they are designed to alleviate will continue to exist"; hence, he said, the rezoning "must be considered premature."

Before the Board, appellees bottomed their application on a claim of error in the comprehensive zoning which had just been adopted. They contended that the rezoning would have no significant impact on the traffic volume in the vicinity; that the present widening of York Road would ease the existing traffic problems; that the subject property, facing commercial development across the street, should have been placed in the same category; and that it was impractical to erect apartments on that site as contemplated by the D.R. 16 and D.R. 3.5 classifications. The protestants, on the other hand, countered these claims with evidence that not only was traffic too heavy on the main arteries, particularly at the intersections, but that it had also inundated their neighborhood streets; and, furthermore, that it had become much worse after the comprehensive rezoning, due to the shopping center across the street from the subject property.

The Board, although noting the existence of the traffic problems in this area, concluded that the Council had been "at least partially in error" in placing the front part of the property in D.R. 16, since it had "completely lost its residential character." The Board also stated:

> "It is the presumption of this Board that the County Council, in considering the front portion of the subject property, really did not envision

apartments constructed on this small portion of land. The small size of this strip would greatly diminish the desirability of the project. It is likely that the Council thought that perhaps a Special Exception for business offices might be in the offing. (emphasis added).

". . . [T]he Board is of the opinion that [the proposed commercial use] would do no more harm, if any, to the residential character of the community to the rear of the subject lot than would a proposal to erect a business office building and, in fact, same would be a harmonious land use considering the elements previously mentioned. . . ."

Apparently, the Board was not impressed with the "Chinese Wall" argument advanced by appellees, since it was of the view that the elevated highway plan was "speculative."

In affirming the Board decision, the trial judge noted:

"Now the Court is of the opinion, and only guided by the experts' opinions, that traffic generated from this B.L. zone, formerly D.R. 16, would be slight, if a shopping center were developed by the owner. The present D.R. 16 gives to the present owners the right to use the property for an apartment house, which, because of the size, is apparently not feasible for an income producing development, or they could file for a special exception before the Zoning Board and ask for the use of an office building, which again, would generate some traffic from that area. . . . The best use of the property would be for that purpose [small shopping area]. *I think that the Council did not err* in the granting of the D.R. 16 for that use, and the only thing this Court is doing is extending to little or no degree the use of the property for B.L. purposes, whatever they might be." (emphasis added).[2]

_____
2. The trial judge rendered his decision orally from the bench at the

In this Court, appellants contend that appellees have failed to sustain the heavy burden imposed upon them to establish error in the comprehensive zoning. Appellees say they produced sufficient evidence to make the issue fairly debatable. Therefore, they urge, the decision of the Board may not be overturned.

In our view, *Stratakis v. Beauchamp*, 268 Md. 643, 304 A. 2d 244 (1973), which involved a similar challenge to the same set of comprehensive zoning maps, is virtually dispositive of the issues presented by this case. The applicable test noted there and recognized by the parties here is:

> ". . . Where a legislative body, or a board of county officials, pursuant to authority conferred upon it, has granted a rezoning of property, the question on judicial review is whether or not such action is arbitrary and discriminatory or fairly debatable, *Montgomery County v. Pleasants*, 266 Md. 462, 295 A. 2d 216 (1972); *Himmelheber v. Charnock*, 258 Md. 636, 267 A. 2d 179 (1970); *Chevy Chase Village v. Mont. Co.*, 258 Md. 27, 264 A. 2d 861 (1970); *Smith v. Co. Comm'rs of Howard Co.*, 252 Md. 280, 249 A. 2d 708 (1969). We shall follow that test in considering this appeal.
>
> "While, in recent years, we have had occasion to enunciate a number of important principles applicable to the law of zoning, perhaps none is

---

conclusion of the hearing. According to the transcript of those proceedings, he then said:

"It would seem to the Court there was no error on the part of the *Council.* The logical approach to the problem would be to grant the B.L. zoning to the parcel they did, and the remainder to be D.R. 3.5. . . ." (emphasis added).

Subsequently, he executed an affidavit in which he stated that the use of the word "Council" was an inadvertence; that he intended to say "Board." The affidavit was later the basis for a Motion to Correct Record in this Court, an effort which was vigorously resisted by appellants. The ruling on that motion was deferred until argument on the merits. In the view we take of this case, it now becomes unnecessary to rule upon the motion. The point seems to be moot for an additional reason. As we have quoted above, the trial judge had previously said, "I think that the Council did not err . . . ."

more rudimentary than the strong presumption of the correctness of original zoning and of comprehensive rezoning. To sustain a piecemeal change in circumstances such as those present here, *strong* evidence of mistake in the original zoning or comprehensive rezoning or evidence of substantial change in the character of the neighborhood must be produced, *Rockville v. Henley,* 268 Md. 469, 302 A. 2d 45 (1973); *Heller v. Prince George's Co.,* 264 Md. 410, 412, 286 A. 2d 772 (1972); *Creswell v. Baltimore Aviation,* 257 Md. 712, 721, 264 A. 2d 838 (1970). Since, as we have also said, this burden is onerous, *Cabin John Ltd. v. Montgomery Co.,* 259 Md. 661, 271 A. 2d 174 (1970); *Creswell v. Baltimore Aviation, supra; Wells v. Pierpont,* 253 Md. 554, 253 A. 2d 749 (1969), the task confronting appellants [appellees], whose application followed the comprehensive rezoning by merely four months, is manifestly a difficult one." 268 Md. at 652-53 (emphasis in original).

As we have already suggested, appellees maintain they met their heavy burden by producing the following evidence: A civil engineer, Robert W. Czaban, called as an expert witness by appellees, testified that the 104 parking spaces proposed for the subject property would generate a negligible traffic flow of 30 to 50 cars per hour compared to the daily number of 25,000 to 28,000 automobiles already burdening the neighborhood. It should be noted that these figures are based on a traffic count taken on Wednesday, March 3, 1971, and do not reflect the situation as of the date of the Board hearing, some sixteen months later. He also supported his opinion by the widening of York Road.

Although the widening project was advertised for bids in September 1971, there is nothing in the record to show that the Council, upon adopting the comprehensive zoning map in March, was unaware of the plans. We think it unlikely that it was. At most, the widening of York Road would possibly reduce some of the pressure at the Ridgely Road intersection. No evidence was introduced to establish that it

would also relieve the traffic problems on the neighborhood streets described by the uncontested testimony of the protestants. In short, the record before us projects a possible improvement in the flow of north-south traffic on York Road, but fails to suggest a remedy for the traffic problems already generated by the local commercial development.

The other expert witness produced by appellees, also a civil engineer, described the "Chinese Wall" effect that the elevation of Greenspring Drive and Charles Street would have upon the subject property, but also conceded the indefiniteness of those plans. That they are not "reasonably probable of fruition in the foreseeable future," *Sembly v. County Bd. of Appeals*, 269 Md. 177, 183, 304 A. 2d 814 (1973); *Chapman v. Montgomery County*, 259 Md. 641, 649, 271 A. 2d 156 (1970), is established indisputably by the evidence. The Board itself agreed that it "would be difficult to predict if and when" the proposal would materialize.. In these circumstances, the evidence describing that project is insufficient to make the issue before the Board fairly debatable.

The second expert witness also rendered an opinion that it would not be "practical" to build apartments on the subject parcel, stating as his reason:

> "You would have it facing the shopping center, you would have very little parking area for recreational purposes and, generally, for anything under 75 units it becomes a management problem to where your break-even point is, so you would have a great deal of problem here in trying to develop this site."

He was joined by one of the appellees, Earl Lipchin, who said that the property could not be utilized for apartments because of a commercial development across the street. Lipchin also stated:

> ". . . [I]t has to be a large apartment house in order for management to be able, in order for management to take care of it. Anything less than 75 to 100 apartments, you have trouble; your

expenses would exceed your amount of income, in order to do it properly.

* * *

"Yes, *you can make money* if you take that one and operate it yourself, yes, *but we are not here for that.*"(emphasis added).

Finally, as a reason for his opinion that the comprehensive zoning was erroneous, he said "in our estimation the best suitable use for that is commercial."

To the extent that the testimony of the latter two witnesses is intended to support a claim of unconstitutional confiscation, it is strikingly reminiscent of the testimony we rejected in *Stratakis v. Beauchamp* and *Rockville v. Henley,* both *supra,* as "generalizations of economic infeasibility." As Judge Digges said for the Court in *Henley:*

"Here, the vague and unsupported expert testimony, however emphatic, does not take the place of the necessary factual support that would prove an applicant is denied all reasonable use of his property. Appellee's experts merely invoked economic infeasibility as some form of magic incantation in hope of transposing one zoning use to another. Such general statements and use of magic words are ineffective. In order to obtain rezoning on the basis of an unconstitutional confiscation an applicant must show that he has been deprived of *all* reasonable use of his property and that it could not be used for *any* of the permitted uses in the existing zone. *Cabin John Ltd. v. Montgomery Co.,* 259 Md. 661, 271 A. 2d 174 (1970); *Montgomery Co. Council v. Kacur,* 253 Md. 220, 252 A. 2d 832 (1969); *Baltimore City v. Borinsky,* 239 Md. 611, 212 A. 2d 508 (1965)." 268 Md. at 477 (emphasis in original).

The evidence here that a special exception for office building construction is available in the D.R. 16 zone underscores the failure of the applicant to show that "he has been deprived

of *all* reasonable use of his property and that it could not be used for *any* of the permitted uses in the existing zone." Indeed, as we have noted, the Board assumed that to be the result intended by the Council in adopting that designation for the front portion of this property.

In sum, what we deal with here are unsupported claims that there was error in the comprehensive zoning because an already over-burdened traffic problem will only be made slightly worse; that apartments cannot succeed when built across the street from commercial development; and an apartment use on this site would be "impractical" since only thirty-six units can be built. These are bald allegations, unsubstantiated by facts sufficient to overcome the presumption of correctness which attaches with the adoption of a comprehensive zoning, especially one adopted only a few weeks before the rezoning application was filed. In other words, the evidence produced to show error in the comprehensive zoning of March 24, 1971 was insufficient to make the issue fairly debatable. Accordingly, the decision of the Board cannot stand, nor can the order of the circuit court affirming it.

> *Order reversed; case remanded for the passage of an order reversing the decision of the County Board of Appeals; costs to be paid by appellees.*